**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MICRO FOCUS INTERNATIONAL PLC SECURITIES LITIGATION | CASE NO.:    18-cv-06763 (ALC) <br><br> ECF CASE <br><br> **JURY TRIAL DEMANDED** |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 2

II.   JURISDICTION AND VENUE ........................................................... 9

III.  PARTIES ............................................................................................ 10

IV.  SUMMARY OF THE ACTION ........................................................ 13

     A.    Background of Micro Focus ................................................. 13

     B.    Background of HPE Software ............................................... 17

     C.    Background of the Merger ................................................... 18

     D.    Both Micro Focus and HPE Software Were Facing Severe Sales and Staffing Problems Before the Merger Closed ..................... 27

          1.    HPE Software Faces Massive Customer and Personnel Attrition ........... 28

          2.    Micro Focus Experiences Problematic Sales and Personnel Attrition ........................................................................... 31

     E.    Micro Focus's and HPE Software's Prior Problems Are Aggravated by the Merger ................................................... 32

     F.    Micro Focus Attempts and Fails to Implement the FAST Software Platform ............................................................................. 35

     G.    The Truth Emerges .............................................................. 38

          1.    The January 8, 2018 Partial Disclosure ................................... 38

          2.    The March 19, 2018 Disclosure .............................................. 45

     H.    Post-Class Period Events ..................................................... 52

V.   VIOLATIONS OF THE EXCHANGE ACT ................................... 53

     A.    Pre-Class Period False and Misleading Statements .............. 53

          1.    September 7, 2016 Merger Announcement ............................. 54

          2.    July 12, 2017 Preliminary Results for the Year Ended April 30, 2017 ........................................................................... 56

| | B. | The Offering Documents ............................................................... | 57 |
|---|---|---|---|
| | C. | September 7, 2017 Capital Markets Day ........................................... | 66 |
| | D. | January 8, 2018 Financial Results for the Six Months Ended October 31, 2017 ................................................................................................. | 72 |
| VI. | | ADDITIONAL ALLEGATIONS OF MICRO FOCUS'S AND THE EXECUTIVE DEFENDANTS' SCIENTER ..................................... | 76 |
| VII. | | ADDITIONAL LOSS CAUSATION ALLEGATIONS ................................. | 83 |
| VIII. | | PRESUMPTION OF RELIANCE ............................................................ | 87 |
| IX. | | VIOLATIONS OF THE SECURITIES ACT ............................................... | 89 |
| X. | | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................... | 97 |
| XI. | | CLASS ACTION ALLEGATIONS ........................................................... | 98 |
| XII. | | CLAIMS FOR RELIEF ....................................................................... | 100 |
| | | COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Micro Focus and the Executive Defendants .......................... | 100 |
| | | COUNT II Violations of Section 20(a) of the Exchange Act Against the Executive Defendants ................................................................... | 102 |
| | | COUNT III Violations of Section 11 of the Securities Act Against Micro Focus, the Director Defendants and Defendants Loosemore, Murdoch, Phillips, and Hsu ...................................................................................... | 104 |
| | | COUNT IV Violations of Section 12(a)(2) of the Securities Act Against Micro Focus ..................................................................................... | 106 |
| | | COUNT V Violations of Section 15 of the Securities Act Against the Director Defendants (Other than Defendant Schultz) and Defendants Loosemore, Murdoch, and Phillips ......................................................................... | 108 |
| XIII. | | PRAYER FOR RELIEF ....................................................................... | 110 |
| XIV. | | JURY DEMAND ................................................................................. | 110 |

1.     Lead Plaintiff Iron Workers' Local No. 25 Pension Fund ("Plaintiff" or "Lead Plaintiff") by and through its undersigned counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), United States Securities and Exchange Commission ("SEC") Rule 10b-5 thereunder and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). Lead Plaintiff brings this class action on behalf of itself and all other persons or entities who purchased or otherwise acquired American Depositary Shares ("ADSs") of Micro Focus International, plc ("Micro Focus" or the "Company") during the period from September 1, 2017 through March 19, 2018 (the "Class Period"), or pursuant or traceable to Micro Focus's issuance of approximately 222 million Micro Focus ADSs on or around September 1, 2017 pursuant to the Offering Documents (defined below), and who were damaged by such purchase or acquisition.

2.     Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, among other things, Lead Counsel's independent investigation, which included review and analysis of, *inter alia*: (i) public filings with the SEC and with the London Stock Exchange; (ii) press releases and media reports issued and disseminated by the Company and by Hewlett Packard Enterprise Company ("HPE"); (iii) transcripts of investor calls and of conferences at which Defendants (defined below) spoke; (iv) analyst reports concerning Micro Focus and HPE; (v) interviews with former HPE and Micro Focus employees; (vi) analyses of securities movement and pricing data; and (vii) other public information regarding the Company. Lead Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the facts supporting the allegations contained in this Complaint are known only to the Defendants or are exclusively within their custody or control. Lead Plaintiff

believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

3.      This case centers around Micro Focus's $8.8 billion acquisition of certain of HPE's software assets ("HPE Software") in September 2017. Defendants made repeated statements about how that merger would increase Micro Focus's profits and result in "superior" "shareholder returns" through various "efficiency improvements." But undisclosed problems undermined the truth of these statements before Micro Focus and HPE Software were even combined, and those problems were only exacerbated after the closing. In particular, hidden problems at both Micro Focus and HPE Software, including massive sales force and customer attrition, the inability to rationalize competing products (which would cannibalize sales), and a disastrous, ill-timed implementation of a new internal computer system, ironically called "FAST" (Future Architecture for Software Transformation), contradicted the positive statements made in support of and immediately following the merger. But the problems concealed during and caused by the Merger, and Micro Focus's ensuing poor performance and the reasons for it, could not be covered up for long. Disclosures on January 8 and March 19, 2018 revealed the true facts concerning poor sales, personnel attrition, and the non-functional FAST system, among other things. The effect of the stock drops immediately following those two disclosures *wiped out approximately $4 billion* of the market capitalization represented by the Micro Focus ADSs issued in the merger.

4.      This story begins on September 7, 2016, when Micro Focus announced that it would purchase certain assets of HPE. These assets, HPE Software, would be spun out from HPE and then merged into Micro Focus (the "Merger"). Micro Focus claimed that the Merger had the "potential to deliver total shareholder returns superior to those likely to be achieved on an organic basis" and the "scope to improve HPE Software's profitability through the application of our

disciplined operating model." Specifically, Micro Focus told investors that the Merger would rapidly double HPE Software's EBITDA margin from approximately 21% to the 46% EBITDA margin Micro Focus was reporting at the time of the Merger announcement.[1] Similarly, Defendant Loosemore, the Executive Chair of Micro Focus, touted on September 8, 2016 that Micro Focus was acquiring HPE Software because it saw "a huge opportunity for efficiency improvement," i.e., cost savings. Micro Focus told investors that it would complete the Merger in the third quarter of 2017 due to the need for certain regulatory approvals.

5.      Securities analysts were excited at the prospect of the Merger. Credit Suisse analysts called it "***transformational***" in a September 8, 2016 report and stated that the Merger would "***roughly treble the level of current profitability***."[2] Canaccord Genuity analysts stated in a September 8, 2016 report that the Merger "could become known as the ***software deal of the century***" and that the Merger would be "***immediately accretive***." Further, Canaccord Genuity noted on September 8, 2016 that the Merger and the possibility of increased EBITDA for HPE Software had the "potential to take the combined enterprise value from ***$16 billion to $20 billion***" and that the "real upside" would come when "Micro Focus's management starts to work its 'magic' on the 21% EBITDA margin currently generated by its target." Similarly, on September 8, 2016, Credit Suisse analysts stated that the "[t]he rationale for this deal is all about cost savings . . . . Management indicates they can add roughly ***20 percentage points*** to the margin of HP Software business over the next 3 years."

6.      Shareholders were also assured that the twelve months between the announcement and the closing of the Merger were being used to ensure a successful integration and transition into

---

[1] EBITDA is "earnings before interest, taxes, depreciation and amortization," and a common measure of a company's operating profits.

[2] All emphasis in quotations in this Complaint is added, except as otherwise noted.

the combined Company. For example, on July 12, 2017, Defendant Stephen Murdoch, who was then the Company's CEO, stated on an investor conference call that Micro Focus was focused on integration and had employed significant integration teams "all managed under a common governance structure, ***tracking more than 10,000 very specific tasks through to completion***" in order to combine the operations of the two companies. Defendant Loosemore assured investors that the Merger would close on September 1, 2017, and that the new business would be "***fully integrate[d]" by November 1, 2017***."

7.     In a Form F-4 Registration Statement (the "Registration Statement") and a Prospectus filed in August 2017 (collectively, the "Offering Documents"), the Company continued to tout the benefits of the Merger, stating that the combination would alleviate certain "challenges" in HPE Software's "maturing infrastructure software business as part of the general market shift to cloud computing and SaaS [Software as a Service]" by separating HPE Software from HPE, thus "creating a more focused, nimble and scalable software business, particularly given Micro Focus's historical experience with and focus on effectively managing portfolios of mature infrastructure software products."

8.     The statements made in support of the Merger, in the registration of Micro Focus ADSs to be used as consideration, and to investors who purchased on the open market were false and misleading and concealed material facts. Specifically, Defendants hid from investors that even before the Merger closed, both Micro Focus and HPE Software were facing undisclosed employee attrition and customer attrition. For example, while Defendants touted in the Offering Documents that the Merger would "add a substantial recurring revenue base to Micro Focus' existing product portfolio," the Offering Documents omitted to disclose that HPE Software was facing high customer attrition due to its spinoff from HPE and that HPE Software customers did not want to

4

renew their contracts or enter into new contracts due to concerns about Micro Focus's reputation for license audits, litigation against customers, and lack of product innovation. As confirmed by former employees ("FEs"), Micro Focus had a reputation of being a place where "software goes to die" (FE 1, identified in ¶76 *infra*),[3] in that Micro Focus did not invest in its products, but instead made money from auditing existing customer licenses. For example, according to FE 2 (identified in ¶44 *infra*), there was a deal pending with Verizon, one of HPE's partners, when the Merger was announced, but Verizon delayed the deal due to pending litigation against Micro Focus.

9. Moreover, historically at HPE, a large number of HPE Software deals involved bundling with other HPE products and services, and such sales would thus be affected when that bundling would not be available as HPE Software was separated from HPE. According to FE 3 (identified in ¶45 *infra*), certain HP Enterprise software products were typically purchased when bundled with HP hardware. The software was then offered to the client for free or at a low cost.

10. Further, Defendants falsely and misleadingly touted the "accelerate[d] operational effectiveness" in "***sales force productivity***" stemming from the Merger, while omitting to disclose that both HPE Software and Micro Focus were facing increasing attrition of sales personnel even before the Merger closed. Numerous former employees confirmed there was an "***exodus***" of sales staff. FE 4 (identified in ¶74 *infra*) stated that about 30% to 40% of FE 4's team left after the Merger. Further, like HPE Software, in the period following the announcement of the Merger, Micro Focus also experienced high sales-employee attrition. *See* Section IV(D)(2). In the face of these high levels of employee attrition, Defendants continued to assure the market that the sales force remained strong. Specifically, on September 7, 2017, Defendant Christopher Hsu, who had been a senior executive at HPE leading the spin-off of HPE Software and became the CEO of the

---

[3] Appendix A identifies by title and tenure each of the Former Employees whose statements are included in this Complaint.

Company and one of the leaders of integration efforts between HPE Software and Micro Focus upon closing of the Merger, denied questions about "turnover and employee morale," stating that "***I was actually somewhat taken aback***. . . . [W]e've got to build a company that ***employees are excited about***, want to be a part of, own and that our customers view as a strategic partner. And in a software company, ***all we have is our people.***"

11.     Defendants also told investors that a benefit of the Merger would be that both HPE Software and Micro Focus would be integrated on one platform, FAST. But FAST was an unmitigated disaster. According to numerous former employees, FAST was a massive failure, caused business to halt "***at a dead standstill***" and actually killed deals because it prevented sales personnel from providing quotes, processing purchase orders, or generating invoices. *See* Section IV(F) *infra.* As sales employees could not send out customer invoices, accounts receivable grew significantly, by 23% year-over-year. FAST would also not allow sales personnel to input data that would allow them to be paid commissions, thus contributing to sales personnel's frustration and greater attrition. *Id.*

12.     The Executive Defendants (defined below) knew or were reckless in not knowing that the statements that they were making to investors were false and misleading. For example, Defendants Hsu and Murdoch were directly and personally responsible for and involved in both the pre-Merger due diligence and the Merger integration and were thus aware of the strategic and operational problems facing Micro Focus and HPE Software. Moreover, the companies' sales, integration, and implementation of the FAST system were core to the operations of both Micro Focus and HPE Software and were topics on which the Executive Defendants were focused and on which they spoke frequently to investors and analysts, making detailed comments. Further, as discussed below, in connection with the Company's disclosures at the end of the Class Period of

significant problems and revenue declines stemming from the Merger, Defendant Hsu "resigned," walking away from millions of dollars in compensation, and Defendant Mike Phillips was demoted from Chief Financial Officer to Director of Mergers & Acquisitions.

13.     As a result of the Merger, Micro Focus issued ADSs representing more than 222 million Micro Focus shares to HPE shareholders. On the first day of trading, the ADSs closed at $29.15, representing a market capitalization of over $6.47 billion.

14.     The truth began to be disclosed in two corrective disclosures, starting on January 8, 2018, when the Company announced its interim results for the six months ended October 31, 2017—the first results since the completion of the Merger. The earnings report included HPE Software's standalone revenue for the twelve months ended October 31, 2017, which was at the very bottom of the prior reported guidance of $2.890 billion to $2.960 billion; and the standalone Micro Focus "legacy" business's revenue during that time period was 2.7% lower than in the prior comparable year. These unexpectedly bad results reflected a serious and previously undisclosed deterioration of almost every aspect of the combined Company's business, as well as problems with the integration of HPE Software and implementation of Micro Focus's new FAST system, that, as detailed here, had been well known internally at Micro Focus and HPE even before the Merger closed. In fact, Micro Focus admitted that "***operational efficiencies [were] put on hold pending the completion of the HPE Software transaction***"; that "[w]e were ***disappointed with sales execution primarily in our Americas region***"; and that the implementation of FAST "***resulted in some delays to customer and partner invoicing and cash collection*** . . . ." These disclosures partially revealed the falsity of Defendants' prior statements about the benefits of the Merger, the progress of the integration and of FAST's implementation, and the Company's sales force.

15.     Analysts reacted negatively to the January 8, 2018 disclosures. Multiple analysts commented on the disruption of HPE Software sales as a result of the loss of bundling with HPE products and services, as well as sales-force attrition and underperformance, especially in the Americas. In response to the January 8, 2018 partial corrective disclosures, Micro Focus ADSs fell $5.76 per ADS on January 8, 2018 from the prior trading day's close, or 16%, to close at $28.92.

16.     However, Defendants assuaged market concerns by telling investors that the integration was going well. Defendant Hsu told investors that Micro Focus had "***already integrated the product teams***," that "***over 7,500 tasks have already been completed to date***," that the Company had taken "***roughly 600 disparate applications to 120 in a completely modern stack,***" that ***70% of the revenue was on FAST***, and that Micro Focus had a "***fully integrated sales team as of November 1***." Defendant Hsu also told investors that he felt "***really good about the progress***" of the integration and, in response to analyst questions about whether the integration was going too fast, stated that "***I'm not worried really about the speed***."

17.     Then, on March 19, 2018, Micro Focus shocked investors again by disclosing that Defendant Hsu was unexpectedly "resigning" as CEO effective immediately, just seven and a half months after the Merger closed, and by again reducing its revenue guidance to reflect a decline of as much as 9% compared to the twelve months ended October 31, 2017. Admitting publicly what had been known by the Executive Defendants and internally at the Company and HPE from well before the Merger closed, Micro Focus revealed that this revenue deterioration was ***caused by problems with the new FAST system***, ***sales-force attrition and underperformance***, and ***post-spinoff problems marketing HPE Software products unbundled from HPE products***. Importantly, this result was far from the massive increase in EBITDA margin by 2019 that

Defendants had touted in the Offering Documents, and there was no possibility that Defendants would obtain that projected result by 2019 given the complete deterioration in the business.

18.     Analysts reacted to the March 19, 2018 news with shock. For example, in a report dated March 20, 2018, Barclays wrote that "*investors seem to have lost all faith in Micro Focus succeeding in its HPE [S]oftware integration*. . . . Execution has clearly worsened, but *all signs point to internal (rather than market) issues*, namely ERP [Enterprise Resource Planning, i.e., FAST] migration, sales churn and global account relationship." Similarly, in a report dated March 20, 2018 and titled "*A reality shock*," Credit Suisse wrote that Micro Focus's "surprise revenue warning and CEO resignation . . . is *obviously negative* and there is a suggestion that *costs have been cut too hard too quickly*."

19.     In response to the March 19, 2018 disclosure, Micro Focus ADSs fell $12.20 per ADS, or 47%, to close at $14.01 that day. As the market continued to absorb the news over the next several days, Micro Focus's ADS price continued to fall, closing at $12.99 on March 22, 2018, representing a decline of more than 55% from the ADS closing price on the date of the Merger's close. Investors who purchased Micro Focus's ADSs at artificially inflated prices during the Class Period or acquired Micro Focus ADSs pursuant to the Offering Documents have suffered substantial losses from Defendants' violations of the federal securities laws.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*, and 77o. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1391(b). In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

22.     Additionally, Micro Focus and other Defendants have asserted that this District is the proper venue for this litigation, including as reflected in a request to transfer this action to this District from the United States District Court for the Northern District of California filed on July 19, 2018. The United States District Court for the Northern District of California granted that request on July 25, 2018. Among other things, Defendants argued that venue was determined by a clause in a deposit agreement that governed Plaintiff's rights and obligations as a holder or beneficial owner of Micro Focus ADSs, which stated that "Holders and Beneficial Owners each irrevocably agree that any legal suit, action or proceeding against or involving the Company or the Depositary, arising out of or based upon the Deposit Agreement, American Depositary Shares, Receipts or the transactions contemplated hereby or thereby or by virtue of ownership thereof, *may only be instituted in a state or federal court in New York, New York*[.]" ECF No. 12 at 2. This statement was made in both Micro Focus's August 4, 2017 Form F-4 and its August 4, 2017 Form F-6 filed with the SEC.

## III.    PARTIES

23.     Lead Plaintiff Iron Workers' Local No. 25 Pension Fund is a pension fund with approximately 5,570 participants and over $530 million in assets under management. As stated in Lead Plaintiff's certification previously filed with this Court (ECF No. 16-1), Lead Plaintiff

acquired Micro Focus ADSs in the HPE Software spinoff from HPE and Merger with Micro Focus

and also purchased Micro Focus ADSs on the open market during the Class Period.

24.     Defendant Micro Focus is an infrastructure software company that develops, sells,

and supports software products and solutions to businesses and various governmental entities. The

Company's customers are international in scope and include large enterprises such as airlines,

healthcare companies and institutions, and national governments. The Company is incorporated in

the United Kingdom, and its headquarters are located at The Lawn, 22-30 Old Bath Road,

Newbury, Berkshire RG14 1QN, United Kingdom. Micro Focus conducts substantial business in

the United States. Micro Focus ADSs trade on the New York Stock Exchange ("NYSE") under

the ticker "MFGP." Each Micro Focus ADS represents one share of Micro Focus common stock,

traded on the London Stock Exchange under the ticker "MCRO." As a foreign company, Micro

Focus is not subject to the SEC's quarterly reporting requirements and files interim reports.

25.     Defendant Christopher Hsu ("Hsu") was the CEO and a director of Micro Focus at

all times during the Class Period. The Offering Documents announced that Hsu would serve as the

Chief Executive Officer and a director of Micro Focus beginning on September 1, 2017, when the

Merger closed, and he did take those positions upon the Merger's closing. Before becoming the

CEO of Micro Focus, Hsu served as the Chief Operating Officer ("COO") of HPE and the

Executive Vice President and General Manager of HPE Software. On March 19, 2018, Micro

Focus announced that Hsu was resigning in order to "spend more time with his family and pursue

another opportunity."

26.     Defendant Stephen Murdoch ("Murdoch") served as the CEO and a director of

Micro Focus until he was replaced in those positions by Hsu as a result of the Merger, after which

Murdoch became the Company's COO. Murdoch resumed his role as CEO and a director of the

11

Company after Defendant Hsu's resignation in March 2018. Murdoch signed the false and misleading Form F-4 filed on August 4, 2017 (the "Registration Statement").

27.     Defendant Mike Phillips ("Phillips") served as the Chief Financial Officer ("CFO") and a director of Micro Focus from September 7, 2010 to January 8, 2018. On January 8, 2018, Micro Focus announced that Phillips was leaving his CFO role to serve as the Company's Director of Mergers and Acquisitions ("M&A"). Phillips signed the false and misleading Registration Statement.

28.     Defendant Kevin Loosemore ("Loosemore") served as the Executive Chairman of Micro Focus at all relevant times. Loosemore signed the false and misleading Registration Statement.

29.     Together, Defendants Hsu, Murdoch, Phillips, and Loosemore are the "Executive Defendants."

30.     Defendant Nils Brauckmann ("Brauckmann") served as the CEO of Micro Focus's open-source product portfolio, which was called its "SUSE Products" segment, and a director of the Company's board (the "Board") at the time of the Merger. Brauckmann signed the false and misleading Registration Statement.

31.     Defendant Karen Slatford ("Slatford") served as a director of the Company at the time of the Merger. Slatford signed the false and misleading Registration Statement.

32.     Defendant Richard Atkins ("Atkins") served as a director of the Company at the time of the Merger. Atkins signed the false and misleading Registration Statement.

33.     Defendant Amanda Brown ("Brown") served as a director of the Company at the time of the Merger. Brown signed the false and misleading Registration Statement.

34.     Defendant Silke Scheiber ("Scheiber") served as a director of the Company at the time of the Merger. Scheiber signed the false and misleading Registration Statement.

35.     Defendant Darren Roos ("Roos") served as a director of the Company at the time of the Merger. Roos signed the false and misleading Registration Statement.

36.     Defendant Giselle Manon ("Manon") served as the authorized U.S. representative of the Company at the time of the Merger. Manon signed the false and misleading Registration Statement.

37.     Defendant John Schultz ("Schultz"), as stated in the Offering Documents, would become a director of the Company following the Merger, which position Schultz assumed upon the closing of the Merger. On December 20, 2017, Micro Focus announced that Schultz would leave the Board.

38.     The Defendants referenced above in ¶¶30-37 are collectively referred to in this Complaint as the "Director Defendants."

39.     The Company, the Executive Defendants, and the Director Defendants are collectively referred to in this Complaint as the "Defendants."

IV.     **SUMMARY OF THE ACTION**

A.     **Background of Micro Focus**

40.     Micro Focus is a software company that specializes in managing predominantly mature infrastructure-software assets. Micro Focus states that it helps organizations bridge their old, mature software assets with new IT and business applications. Micro Focus's solution portfolios include COBOL Development and Mainframe Solutions (a computer-programing language designed for business use that has was first commercially developed in the 1960s), Host Connectivity (products to help intranet, extranet and Web users access data on an internal system), Identity and Access Security, IT Development and Operations Management Tools, and

Collaboration and Networking. At all relevant times, the Company's SUSE Products segment provided interoperable Linux (a family of free and open-source software operating systems), cloud infrastructure, and storage solutions.[4]

41.    Micro Focus was founded in 1976, taken private in 2001, and relisted on the London Stock Exchange in 2005. The Company is headquartered in the United Kingdom, with core operations in the United Kingdom, USA, Germany and Japan. Micro Focus's fiscal year-end is October 31, and it files reports of its interim results every six months under the International Financial Reporting Standards. Since the Merger, Micro Focus has United States listed sponsored ADSs that trade on the NYSE.

42.    Micro Focus has experienced historical instability, and analysts in the 1990s dubbed it "Hocus Pocus Micro Focus" due to its volatile earnings and profit warnings. However, by the time that it announced its Merger with HPE Software, Micro Focus had become a much more stable, predictable company, generating significant revenue and cash-flow through longstanding software licenses sold to its customers. Micro Focus maintained revenue streams from longstanding software installations used by clients, each of which generated ongoing license revenues. As long as the customers continued to use these "legacy" software products, Micro Focus would realize a low-cost, consistent stream of cash. The strategy did not require, or encourage, investment in development of new or innovative software products. While this business model was not necessarily expected to generate significant growth, it was a reliable model for generating consistent cash flow. For example, in a May 24, 2016 report, JP Morgan analysts noted that Micro Focus's mix of business "should allow MCRO to achieve **stable revenues** by 2017"

---

[4] On July 2, 2018, Micro Focus announced that it had reached an agreement to sell its SUSE business segment to Marcel Bidco GmbH for $2.535 billion.

and that "[t]he company generates ***strong and consistent cash flows*** with >70% of revenues

recurring and cash conversion consistently strong."

43.     Micro Focus's ability to generate this type of revenue relied substantially on

"license audits"—reviews of outstanding licenses seeking to maximize revenue by ensuring that

customers paid in full for any Micro Focus products that remained in use. According to an April

28, 2017 Deutsche Bank report, "[a]s the majority of MCRO's assets fall into the maturity and

decline categories, there is often little scope for new product development/upsell or new customer

acquisition. As such the top line improvement comes almost entirely from license audit and

maintenance revenue improvement." According to the April 28, 2017 Deutsche Bank report,

following an acquisition, Micro Focus will typically perform a license audit to identify

underpricing in the acquired company's customer license billings. Often Micro Focus will "offer

a bundled offering in conjunction with another product as an alternative to a simple pricing

increase." Furthermore, Micro Focus "tend[s] to have significant bargaining power given that the

products are often a fairly small percentage of a [Chief Technology Officer's] budget, and as such

are difficult, and costly to replace."

44.     As discussed below, many former employees, including FE 2 corroborated that

Micro Focus has a reputation of being litigious towards its customers and generates revenues by

engaging in aggressive license audits.[5] Additionally, in 2016 the "Campaign for Clear Licensing"

found that The Attachmate Group ("TAG") (acquired by Micro Focus in 2014, as discussed below)

was voted the third worst vendor during an audit process based on the use of aggressive behavior

---

[5] FE 2 worked at HPE starting in 2012, serving as a Director Alliance Sales 2014 to 2017, and assumed a similar role as a Director of Global System Integrator Sales at Micro Focus from the Merger closing until separating from the Company in March 2018.

or a focus only on short term revenue. According to FE 5, there was an increase in audits of HPE Software customers after the Merger closed.[6]

45.     More specifically, Micro Focus's strategy is, according to a November 27, 2017 Deutsche Bank report, to acquire software through mergers and acquisitions and maintain "unloved poorly-managed infrastructure software assets" by using financial leverage and aggressive cost-cutting. This strategy was confirmed by several former employees of Micro Focus, who made clear that Micro Focus does not invest in its software portfolio to add features or innovation. For example, according to FE 3, Micro Focus has been referred to as a "software hospice."[7] According to FE 3, instead of putting money into a product, Micro Focus was commonly known for acquiring software companies to collect licensing fees from software products that were previously sold. Further, as confirmed by FE 3, it was common knowledge that Micro Focus was not in the business of rationalizing its acquisitions and, instead, left them to compete with each other.

46.     In one of its most recent M&A transactions, Micro Focus acquired TAG, a U.S. based software company that included the SUSE business, in 2014. Similarly, Micro Focus acquired Borland Software, a developer of application lifecycle management tools, for $75 million in 2009 and also acquired the application testing and automated software quality business, Compuware, in this deal. The Borland acquisition was especially problematic for Micro Focus. As a Credit Suisse analyst stated on July 16, 2018, with regard to the Merger, "this is not the first time

[6] FE 5 was formerly a Senior Software Account Executive focused on application delivery solutions and strategic accounts. FE 5 started at HPE in August of 2013 and then assumed a similar role with Micro Focus after the Merger closed until leaving the Company in March 2018.

[7] FE 3 was a Senior Product Marketing Manager at Micro Focus from November 2015 through September 2017, who had previously worked at Hewlett-Packard through 2011 and was familiar with the HPE organization and sales practices.

that [Micro Focus] has underestimated a transaction and cut costs too hard too quickly. In particular, there was one notable period of disappointment following the acquisitions of Borland and Compuware." Further, the same analyst stated that Micro Focus has dealt with several acquisitions which "required material restructuring: Borland/Compuware, Attachmate, and HP Software. And 2 of these have led to material investor disappointment, at least in the short term – Borland/Compuware and HPE Software."

    **B.**    **Background of HPE Software**

    47.    The HPE Software assets that were acquired by Micro Focus in the Merger had been an operating unit of HPE, which itself had previously been a part of the Hewlett-Packard Company. In 2015, the Hewlett-Packard Company split into two entities: (i) a company that primarily sold personal computers and printers, which was called HP Inc.; and (ii) HPE, its other enterprise and software businesses. HPE consisted of HPE Software, HPE Enterprise Services (which was also subsequently spun off), HPE Enterprise Group (which provides servers, storage, networking, consulting, and support), and HPE Financial Services.

    48.    The HPE Software assets that were eventually sold to Micro Focus included assets that were acquired by Hewlett-Packard in 2011 in that company's acquisition of Autonomy Corporation plc. Hewlett-Packard acquired Autonomy for $11 billion, and then wrote down $8.8 billion of its acquisition of Autonomy, in effect admitting that the company was worth 79% less than Hewlett-Packard had paid for it. It attributed $5 billion of the write-off to what it called a "willful effort on behalf of certain former Autonomy employees to inflate the underlying financial metrics of the company in order to mislead investors and potential buyers." This acquisition led to shareholder litigation, as well as investigations by the SEC, the Department of Justice, and the UK Serious Fraud Office and Financial Reporting Council. The resulting turmoil from the Autonomy

acquisition led to significant board changes at Hewlett-Packard and layoffs of 27,000 Hewlett-Packard staff. Hewlett-Packard subsequently disposed of 80% of the Autonomy assets that it had acquired, and the remaining 20% became part of HPE. This 20% was then included in the HPE Software assets sold to Micro Focus in the Merger. As stated by a market analyst at ETX Capital, and as quoted in the *Guardian* in response to the announcement of the spin-off of HPE Software and its sale to Micro Focus: "HPE will no doubt be glad to see the back of Autonomy, which it acquired in 2011 in one of the worst deals in recent corporate history."

        **C.**      **Background of the Merger**

      49.     In early 2016, HPE and Micro Focus began discussions regarding a possible business combination. According to the Prospectus (defined below), at a meeting on January 27, 2016, the HPE board "reviewed and discussed the strategic direction, performance and prospects of HPE, including potential strategic alternatives and strategic opportunities. Among other strategic alternatives, the HPE Board and HPE's management discussed a potential separation and/or potential merger of certain non-core software assets (i.e., HPE Software) with a third party." The HPE board also discussed a divestiture of HPE's Enterprise Services Business, which eventually led to HPE combining its HPE Enterprise Services business with Computer Sciences Corporation. That transaction closed in April 2017.

      50.     In April 2016, Micro Focus management and HPE discussed a potential transaction involving HPE Software. On April 17, 2016, Micro Focus and HPE executed a mutual nondisclosure agreement in which each party agreed to keep confidential certain information discussed as part of the potential merger discussions.

      51.     On May 23, 2016, the Micro Focus Board held a meeting attended by Micro Focus management, during which the potential transaction involving HPE Software was discussed,

18

including a proposed non-binding offer to HPE. On June 17, 2016, Micro Focus submitted a preliminary indication of interest to HPE, proposing a spin-merge transaction that valued HPE Software at approximately $7.4 billion.

52.     After receiving this indication of interest from Micro Focus, HPE tried, but failed, to market HPE Software to other software companies or financial acquirers. Specifically, three potential financial acquirers submitted indications of interest to acquire HPE Software for cash. At a meeting of the HPE board on June 22, 2016, the board considered the other indications of interest, but "did not independently consider the merits of a standalone spinoff of HPE Software because it had determined that HPE Software lacked the scale to be successful in the software business on a standalone basis . . . ." The first potential financial acquirer eventually submitted an indication of interest less favorable to HPE than the transaction that Micro Focus had proposed. The second and third potential financial acquirers indicated, following the completion of their due diligence, that they no longer intended to pursue a potential transaction. HPE also later contacted a fourth potential financial acquirer, which eventually indicated that it no longer intended to pursue a potential transaction given "valuation and timing expectations." Additionally, HPE contacted two software companies other than Micro Focus, one of which told HPE that it would not pursue a potential transaction, and one of which provided an indication of interest that was less favorable to HPE than Micro Focus's.

53.     During August and early September 2016, HPE and Micro Focus negotiated transaction terms. During this time period, as described in the Offering Documents, both Micro Focus and HPE conducted extensive due diligence of each other:

> a.     "During late June and July 2016, members of HPE's management held separate in-person management presentations and due diligence sessions regarding HPE Software with representatives of Micro Focus . . ."

b.      "On August 19, 2016, the Micro Focus Board held a meeting attended by Micro Focus management, during which Mr. Loosemore reported to the Micro Focus Board the status of due diligence and discussions with HPE."

c.      During August and early September 2016, Micro Focus and HPE and "their respective advisors engaged in mutual due diligence of Micro Focus' business and HPE Software, as applicable."

d.      "On September 2, 2016, the Audit Committee of the Micro Focus Board held a meeting attended by Micro Focus' management to review the status of due diligence and negotiations regarding the potential transaction. Micro Focus' financial, legal, tax and operational advisors also attended the meeting. During the meeting, Micro Focus' advisors reviewed with the Micro Focus Board the transaction structure, the due diligence status on legal, tax, financial and operational matters, and key terms of the draft transaction agreements, including the merger agreement, the separation and distribution agreement and ancillary agreements. The Audit Committee also reviewed the risks associated with the transaction. At the meeting, the Audit Committee concluded that the proposed transaction was in the best interest of Micro Focus and had the support of the Audit Committee."

e.      "On September 5, 2016, the Micro Focus Board held a meeting attended by Micro Focus' management to discuss the status of draft transaction agreements and planned public announcements relating to the proposed transaction. During the meeting, the Micro Focus Board reviewed and discussed with Micro Focus' management the results of ongoing due diligence and the latest terms of the transaction documents. . . . Following discussion, the Micro Focus Board instructed members of senior management to proceed to finalize the definitive transaction documents with HPE based on the terms discussed with the Micro Focus Board."

f.      "Also on September 6, 2016, the HPE Board held a meeting, at which it reviewed the status of negotiations with Micro Focus and the terms of the proposed transaction with, and received a detailed summary of the results of HPE's due diligence of Micro Focus from, HPE's management and advisors. Following discussion, HPE's management recommended that the HPE Board approve the proposed transaction with Micro Focus. Following discussion among the directors, the HPE Board unanimously determined that the Separation, the Distribution and the Merger are advisable and in the best interests of HPE and the HPE Stockholders, and approved, adopted and authorized HPE's management to enter into the Merger Agreement, the Separation and Distribution Agreement and the other agreements contemplated thereby. "

54.     On August 22, 2016, Defendants Loosemore, Phillips, and Slatford, along with

Steve Schuckenbrock, a Micro Focus board member at that time, attended a meeting at the offices

of Wachtell, Lipton, Rosen & Katz in New York and presented to members of the HPE board. On September 6, 2016 a special committee consisting of Defendant Loosemore, Defendant Phillips, and Defendant Atkins approved the Merger. On the same day, the HPE board approved the Merger. On September 7, 2016, Micro Focus issued a press release announcing the proposed Merger with HPE Software.

55.     HPE and Micro Focus announced that the HPE Software assets included Application Delivery Management, Big Data, Enterprise Security, Information Management & Governance, and IT Operations Management businesses. Defendants pitched the Merger as similar to the TAG merger, and one that would "transform" Micro Focus.

56.     The HPE Software assets to be acquired in the Merger were valued at $8.8 billion, larger than Micro Focus's market capitalization at the time (£4.48 billion or approximately $5.9 billion), and were designed *to triple the Company's revenues*. According to the Merger terms, Micro Focus would issue newly registered ADSs to shareholders of HPE as of August 21, 2017 (the "Record Date") as consideration in the Merger, such that immediately following the completion of the Merger, HPE shareholders would own 50.1% of the fully diluted share capital of the combined Company. In order to facilitate the Merger and the payment to HPE shareholders, HPE Software would be spun-off by HPE to Seattle SpinCo, Inc., a wholly owned subsidiary of HPE (HPE shareholders would then receive shares in Seattle SpinCo, Inc., representing ownership of the HPE Software assets, which in turn would be exchanged for the Micro Focus ADSs, ultimately resulting in HPE shareholders as of August 21, 2017, acquiring the Micro Focus ADSs). As defined by the terms in the Offering Documents (defined below), the exchange ratio resulted in HPE shareholders receiving 0.13732611 ADSs of Micro Focus for every share of HPE common stock held at the close of business on the Record Date. In addition, HPE received $2.5 billion in

21

cash, financed through newly incurred indebtedness of HPE Software, and Micro Focus shareholders received a $500 million "return of value" dividend before completion of the Merger.

57.     Micro Focus announced the Merger on September 7, 2016, and touted it as creating "one of the world's largest pure-play software companies." Micro Focus announced that it would complete the Merger in the third quarter of 2017, but that in the meantime it was "Business as Usual."

58.     Micro Focus's September 7, 2016 press release described the Merger as a "[r]are opportunity to increase significantly Micro Focus' scale and breadth through the combination with a business *operating in adjacent and complementary product areas* with similar characteristics and benefitting from a high proportion of recurring revenues and strong cash conversion." The press release also stated that the Merger would create "one of the world's largest pure-play infrastructure software companies" with "annual revenues of US $4.5 billion and EBITDA of US$1.35 billion." Defendant Loosemore, Micro Focus's Executive Chairman at the time, was quoted in the press release as stating that the Merger "represents a compelling opportunity to create significant value for both companies' shareholders."

59.     In a September 7, 2016 email from Defendant Loosemore to all Micro Focus employees that was filed with the SEC on the same day, he stated that the Merger had the "*potential to deliver total shareholder returns superior to those likely to be achieved on an organic basis,*" and the "*scope to improve HPE Software's profitability through the application of our disciplined operating model.*" In investor presentations also filed on September 7, 2016, Micro Focus told investors that it would be "possible to *improve the margin delivered by HPE Software's mature software assets to Micro Focus' level by the end of the third full financial year following completion.*" As discussed further below, this would be a huge increase in

profitability to be realized nearly immediately following the Merger, and represented one of the key expected benefits of the Merger to investors.

60.     Micro Focus and HPE both held investor calls at the time of the announcement of the planned Merger. On the Micro Focus call, Defendant Loosemore announced the terms of the Merger and also announced that Micro Focus would be buying a business with "50,000 customers, global footprint, approximately 60% of recurring revenues."

61.     Further, Micro Focus touted that the Merger would rapidly double the Company's profits and profit margins (as measured by EBITDA) by fiscal year 2019. Specifically, in proxy solicitations filed in connection with the Merger on September 7, 2016, Micro Focus described in detail that after three years it would increase the acquired HPE Software business's EBITDA margin from approximately 21% to the 46% EBITDA margin that Micro Focus was reporting at the time of the Merger announcement. As estimated by analysts at Canaccord Genuity on September 8, 2016, raising HPE Software's EBITDA margin "has the potential to take the combined enterprise value from $16 billion to $20 billion suggesting substantial potential upside for the shares as debt is paid down over the two years post deal closures."

62.     Investors and analysts were favorably impressed by the announcement of the planned Merger. For example, Canaccord Genuity analysts stated in a September 8, 2016 report that the Merger "could become known as the ***software deal of the century***" and that the Merger would be "***immediately accretive***." Canaccord Genuity analysts also wrote that the "real upside" would come when "Micro Focus's management starts to work its 'magic' on the 21% EBITDA margin currently generated by its target." As a result of the Merger announcement, Canaccord moved its recommendation on Micro Focus to "BUY" from "HOLD." Similarly, in a report dated September 8, 2016, Credit Suisse analysts called the Merger "***transformational***" and stated that

the Merger would "*roughly treble the level of current profitability*." The Credit Suisse analysts stated on September 8, 2016 that the Merger "doesn't change the growth profile of Micro Focus. The rationale for this deal is instead all about cost savings. HPE is running at 23% EBITDA margins versus Micro at roughly 46%. *Management indicates they can add roughly 20 percentage points to the margin of HP Software business over the next 3 years*."

63.     Additionally, the Company informed investors in its report of interim financial results on December 14, 2016 that it had established an "Integration Management Office" in preparation for the merger. Additionally, it disclosed that HPE Software was "implementing a new business software stack as part of the carve out. It is our intention that Micro Focus will move onto the new systems after completion." As discussed above, this program was called "FAST."

64.     HPE Software and Micro Focus announced on January 17, 2017 that Defendant Hsu, a senior executive at HPE and head of the HPE Software business, would be the CEO of the combined Company. Hsu had been personally in charge of carving out HPE Software from the rest of HPE in order to facilitate the Merger. Analysts were pleased with the appointment of Defendant Hsu as the CEO of the combined entity. As stated by UBS in a January 17, 2017 analyst report, "[w]e believe Hsu understands HPE Software very well, and we expect he will be seen as a reassuring appointment by the 14,000 strong HPE staff being acquired by 5,000-person Micro Focus."

65.     The Company projected that the Merger would be consummated in the third quarter of 2017, nearly a year after it was first announced, in order to accommodate the time needed for various regulatory approvals. The Company, however, reassured shareholders that the time was being used to ensure a successful integration and transition into the combined Company.

66.    For example, on July 12, 2017, Micro Focus held an earnings call to discuss its preliminary financial results for the fiscal quarter and year ended April 30, 2017. On the call, Defendant Murdoch, who was then the Company's CEO, stated that Micro Focus had employed significant integration teams "***all managed under a common governance structure, tracking more than 10,000 very specific tasks through to completion***" in order to lay out the operational aspects of the combined Company. Moreover, Defendant Murdoch stated that the way in which Micro Focus was handling the Merger was very granular in that it was managing the integration process with "2 very significant teams; 1 on the HPE side, 1 on our side, all managed under a common governance structure, ***tracking more than 10,000 very specific tasks through to completion.***" Similarly, Defendant Loosemore stated that the Merger was expected to be completed by September 1, 2017, and that the new business would be "***fully integrate[d]" by November 1, 2017.***[8] Further, in Micro Focus's unaudited preliminary results for the quarter and year ended April 30, 2017, Micro Focus announced that it "will do nothing that will constrain our ability to achieve organic growth and we are currently investing significant amounts on activities designed to enhance growth."

67.    Micro Focus shareholders approved the proposal relating to the Merger on May 26, 2017. HPE Software shareholders did not vote on the Merger.

68.    On August 3, 2017, Seattle SpinCo, Inc., the Merger subsidiary for HPE Software shares, filed a Form 10 with the SEC. The Form 10 incorporated by reference and attached as an exhibit a prospectus.

69.    On August 4, 2017, Micro Focus filed with the SEC a registration statement on Form F-4. The Form F-4 was amended on August 15, 2017 and was declared effective by the SEC

---

[8] As a result of the Merger, the fiscal year end for the Company was changed from April 30 to October 31.

on the same day (as defined above, the "Registration Statement"). On August 22, 2017, Micro Focus filed with the SEC a prospectus on Form 424B3 for the ADSs to be issued in the Merger, which formed a part of the Registration Statement on Form F-4 (the "Prospectus" and, together with the Registration Statement, the "Offering Documents"). The Prospectus stated in the section called "Where You Can Find More Information" that "Micro Focus has filed with the SEC a Registration Statement on Form F-4 (Reg. No. 333-219678) of which this information statement/prospectus forms a part, including the exhibits thereto, to register under the Securities Act the Micro Focus Shares that HPE Stockholders will receive in the form of Micro Focus ADSs in connection with the Merger." The Prospectus also acknowledged on page 17 that Micro Focus was obligated to register Micro Focus ADSs and shares under the Securities Act "with respect to the Merger . . . ."

70.     As discussed in greater detail below, the Offering Documents touted the Merger as one that would "accelerate financial and operational performance" and "creat[e] a more focused, nimble and scalable software business." Additionally, the Offering Documents stated that the Merger would alleviate certain "challenges in [HPE's] maturing infrastructure software business as part of the general market shift to cloud computing and SaaS" by separating HPE Software from HPE. The Offering Documents stated that "these challenges were exacerbated by HPE Software's lack of a separate general and administrative expense structure within HPE, scalability challenges (including in sales and marketing) and demands on HPE management from HPE's other businesses." The Offering Documents further stated that "*a combination of HPE Software with Micro Focus would help address these challenges by creating a more focused, nimble and scalable software business, particularly given Micro Focus' historical experience with and focus on effectively managing portfolios of mature infrastructure software products.*"

71.     The Merger was completed on September 1, 2017. As a result of the Merger, Micro Focus issued ADSs representing more than 222 million Micro Focus shares to HPE shareholders as of the Record Date. On the first day of trading, the ADSs closed at $29.15, representing a market capitalization of over $6.47 billion.

72.     Micro Focus also announced at the closing of the Merger the implementation of FAST. According to Micro Focus presentations filed with the SEC on September 7, 2017, "FAST will deliver an integrated end-to-end cloud-based system enabling Micro Focus to win in the market." Micro Focus also told investors on a September 7, 2017 investor call that FAST was "***one of the fundamental building blocks for operating the business effectively as we want to in our current guide*** and also pervading that platform for the future." Further, Defendant Murdoch told investors on the September 7, 2017 call that HPE Software had built out the FAST system over the last 13 months and thus had a "tremendous amount of institutional knowledge on the—on what hybrid IT and operation for a business of our scale looks like," and that Micro Focus would adopt HPE Software's approach to FAST as it moved forward.

**D.     Both Micro Focus and HPE Software Were Facing Severe Sales and Staffing Problems Before the Merger Closed**

73.     While Defendants and HPE made numerous positive statements in the time period between the announcement of the Merger in September 2016 and its closing nearly one year later, none of the public statements disclosed or properly informed investors of several significant underlying problems at both HPE Software and Micro Focus that would later be revealed to have undermined the success of the Merger in the near term. As described further below, those problems were only exacerbated by the Merger.

### 1.    HPE Software Faces Massive Customer and Personnel Attrition

74.    According to FE 4, HPE Software had many problems before its Merger with Micro Focus, and the Merger was just a way to "put a dress on a pig."[9] As discussed below, according to several former employees, the problems that HPE Software was experiencing increased significantly after it announced the Merger with Micro Focus. Additionally, HPE Software's spin-off from HPE caused enormous friction; separating HPE Software from the core HPE business required considerable work and caused much disruption in the HPE Software business. For these reasons, during the period after the September 2016 announcement of the Merger, HPE Software's business was adversely affected by the fact that HPE Software's clients had concerns that led many customers to discontinue their contracts or decline to enter into new ones.

75.    *First*, as soon as the Merger was announced, many HPE Software customers declined to renew their contracts with HPE Software because it was going to be acquired by Micro Focus, which had a reputation for auditing licenses and increasing maintenance prices, without investing in software to update it, add features, or adapt to changing customer needs or advances. In effect, HPE Software's customers were concerned that they were buying a product that would quickly become stale or obsolete. Indeed, numerous former employees, such as FE 6 called Micro Focus a company where "software goes to die."[10] Similarly, FE 7 stated that Micro Focus focuses on keeping existing customers as opposed to winning new customers.[11] On the other hand, the focus of HPE Software had always been to get business from new customers.

---

[9] FE 4 was a former HPE sales employee starting in 2014, and a Regional Director of HPE Enterprise Security Software from 2016 to 2017 until the Merger, when FE 4 assumed the same position at Micro Focus until separating from the Company in March of 2018.

[10] FE 6 was a Compliance Manager at HPE from May 2011 to September 2017 and then at Micro Focus from the Merger until June 2018.

[11] FE 7 worked at HP from 2005 to 2012 and was a Vice President, Worldwide Alliances and Original Equipment Manufacturer at HPE and then Micro Focus from April 2017 until February 2018.

76.     FE 1 stated that after the Merger was announced in September 2016, the feedback

from HPE Software customers was that "Micro Focus is where software goes to die" because

Micro Focus does the minimum to keep its software updated and then hopes that the customers do

not have the initiative to move to other software.[12] According to FE 1, some of HPE Software's

most important clients were consulting firms, which would recommend HPE Software to their

clients.     These     consulting     firms     included,     among     others,     Accenture,     Deloitte,

PricewaterhouseCoopers, Capgemini, and Indian consulting firms such as Tata, Infosys, Wipro,

HCL, and Tech Mahindra. According to FE 1, there was concern from these firms about which

HPE Software products would be eliminated by Micro Focus and whether Micro Focus would

continue innovating to add features and update former HPE Software products. According to FE

1, once the Merger was announced, this concern led to a decrease in consulting firms choosing or

recommending HPE Software. FE 1 thought that among the business partners that FE 1 worked

with, "easily" 50% of the deals stopped and were either abandoned entirely or were paused and

never got restarted. FE 1 estimated that the top ten partners he worked with were accountable for

around an eighth of HPE's annual revenue. According to FE 1, there were reports that would

describe the new customers that the Company had obtained and the renewal percentage. FE 1

stated that it was harder to get customers to renew after the Merger announcement.

77.     Similarly, according to FE 6 (identified in ¶75), based on FE 6's experience with

customer auditing and compliance, after the Merger was announced there was a large reduction in

enterprise-license renewals by Fortune 100 companies, HPE Software's biggest clients. FE 6

thought that the reduction was 50-60% of those Fortune 100 companies.

---

[12] FE 1 is a former HPE employee, who served as a Global Alliance Manager from 2014 to 2017 and in a similar
Global Alliances role at Micro Focus until leaving the Company in November of 2017, working with representatives
at companies, such as consulting firms, that would partner with Micro Focus/HPE to sell software to their own
customers.

78.     According to FE 4 (identified in ¶74), HPE created a "talk track" for employees whose customer asked questions about the Merger. This talk track informed employees to tell customers not to worry about the things they heard about Micro Focus regarding aggressive auditing, and that the people responsible for that have all been fired and are not at Micro Focus anymore. Further, FE 4 stated that at town hall meetings held every quarter, Defendant Hsu and Sue Barsamian, then HPE's Chief Sales and Marketing Officer (who assumed the same role at Micro Focus after the Merger), would tell employees to let them know if they had accounts that were at risk of leaving, so that they could get out in front of it and "walk them off the ledge."

79.     FE 1 (identified in ¶76) also stated that most HPE Software products had strong competitors, and after the announcement of the Merger in September 2016, those competitors told their customers not to buy HPE Software products because under Micro Focus the products would be "dead" or not be invested in or functionally inferior in two years. FE 1 stated that customers would rather buy software that is almost as good as the software from HPE Software, but that has a certain future. According to FE 1, these competitors included VMWare, which is now part of Dell, Oracle, and ServiceNow. According to FE 1, from FE 1's experience and from speaking with other sales personnel, no sales person at HPE Software started a new conversation in the days after the Merger announcement with a customer who was excited to buy HPE Software's products.

80.     ***Second***, historically at HPE, a large number of HPE Software deals involved bundling with HPE hardware, and sales of this software could not continue without the corresponding HPE hardware. According to FE 3 (identified in ¶45), certain HP Enterprise software products were typically purchased when bundled with HP hardware. The software was then offered to the client for free or at a low cost. This practice, and any associated software sales, declined after the announcement of the Merger, and were lost entirely after the Merger closed.

The adverse effect caused by the cessation of bundling was admitted by the Company in January 2018, when it disclosed the loss of revenue from bundling was a significant driver of the Company's poor performance in fiscal 2017.

81.     **_Third_**, following the Merger announcement, HPE Software started experiencing massive sales-personnel attrition. According to FE 1 (identified in ¶76), HPE held its yearly sales "kickoff" party in November of 2016, and all anyone wanted to talk about was the Merger. Defendant Hsu and Sue Barsamian (Chief Sales Officer) presented, and both spent most of their time onstage trying to reassure everyone that it was "all roses and unicorns." Sales personnel left HPE Software, in part, because they understood that they would no longer be able to bring in new deals or even renew previous deals with HPE Software as part of Micro Focus. FE 2 stated, for example, that for the two years before the Merger, FE 2 made 125% to 150% of FE 2's target quota, but was on pace to only hit 25% of the target quota while working for Micro Focus. FE 1's team had 100% turnover after the Merger announcement, and as far as FE 1 was aware, they all left voluntarily. According to FE 2 (identified in ¶44), from FE 2's experience working with the entire HPE sales force, Micro Focus lost approximately 50% of the HPE Software sales force after the announcement of the Merger. As detailed below, in March 2018 the Company admitted that sales-force attrition was a major driver of the Company's poor performance.

### 2.     Micro Focus Experiences Problematic Sales and Personnel Attrition

82.     Like HPE, in the period following announcement of the Merger, Micro Focus was also experiencing massive sales-personnel attrition and, as discussed below, Defendants later disclosed that the attrition in some areas was in the 25% to 30% range. According to FE 3 (identified in ¶45), who worked at Micro Focus while the Merger was pending, people were leaving the Micro Focus sales force that FE 3 worked with in sales of Borland products, and this

sales force dwindled down even before the Merger closed. According to FE 3, people were leaving the Company on their own, and there were also layoffs. As discussed below, this fact is further corroborated by the Company's March 19, 2018 disclosures, significantly attributing its poor post-Merger performance to sales-personnel attrition and the adverse effects of previously undisclosed sales-force layoffs at Micro Focus.

**E.     Micro Focus's and HPE Software's Prior Problems Are Aggravated by the Merger**

83.     According to numerous former employees, pre-existing problems at both HPE Software and Micro Focus increased exponentially after the Merger closed due to the nature of the Merger itself and the speed at which Micro Focus was attempting to integrate the two companies. These problems also stemmed from the fact that, as competitors, Micro Focus and HPE Software shared little information with each other before the close of the Merger.

84.     Numerous former employees corroborated that following the closing of the Merger, the combined Micro Focus experienced continued attrition among its sales personnel and customers. As discussed below, former employees attributed this attrition to deficiencies in Micro Focus's planned integration and HPE Software customers' unwillingness to move to Micro Focus.

85.     FE 4 (identified in ¶74) confirmed that at least 30% to 40% of FE 4's team left as a result of the Merger, and that a conservative number would be that at least a quarter of the sales force across the entire organization left. FE 4 stated that the sales people leaving were top performers and did not want to work for a company that could not take care of their clients. Aside from massive sales-personnel attrition, Micro Focus was overly aggressive in laying off sales employees in an effort to reduce costs, as Micro Focus admitted later in the Class Period.

86.     According to FE 7 (identified in ¶75), the turnover of sales staff was pretty aggressive, because once the sales staff saw that the sales focus was going to be on the existing

customer base, they missed the entrepreneurial competition. Moreover, according to FE 7, Micro Focus effectively shut down marketing, and FE 7 had no funding to do promotions of products with his customers. FE 8 stated that easily a third of the inside sales team when FE 8 was first hired in June 2016 had left by February 2018.[13] FE 9 stated that the difference in attendees at the sales kickoff from November 2016 to November 2017 was "mind blowing" and estimated that around 30-40% of the employees who were there in 2016 were not there in 2017.[14] FE 7 stated that once sales personnel left, Micro Focus did not replace them because of the "cost pressure" to meet targeted EBITDA.

87.     According to FE 8 (identified in ¶86), there was also a huge "exodus" of sales staff because, as discussed in more detail below, the FAST software that Micro Focus implemented was unable to process sales quotes and purchase orders. FE 8 stated that while the program was called FAST, "it was at a dead standstill." FE 10 also corroborated that there was a "huge exodus" of talented sales representatives that left Micro Focus as a result of the Merger.[15]

88.     Former employees also confirmed that reputational issues with Micro Focus and its practice of conducting aggressive license audits, to be enforced by litigation if necessary, affected the sales force's ability to complete deals, contributing to personnel attrition. For example, according to FE 2 (identified in ¶44), Micro Focus had a compliance model according to which it would sue its customer base for lapsed licenses, and this hurt FE 2's ability to sell Micro Focus products to former HPE Software users after the Merger. Similarly, FE 6 (identified in ¶75) stated

---

[13] FE 8 was an Enterprise Account Manager at HPE starting in June 2016 and served in that position at Micro Focus following the Merger until 2018.

[14] FE 9 was a Sales Executive – Information Management and Governance at HPE from June 2016 through the Merger, and then at Micro Focus until May 2018.

[15] FE 10 worked at HPE starting in 2009, serving as a Senior Manager, responsible for Global Corporate Sales Policy and Enterprise Contract Operations from 2013 through the date of the Merger and then taking on a similar role at Micro Focus with responsibility for Corporate Sales Policy and Business Standards until leaving the Company in July 2018.

that many HPE Software clients did not want to renew after the Merger announcement because Micro Focus was known for being very litigious and aggressive with customers. For example, according to FE 2, there was a deal pending with Verizon, one of HPE's partner companies. When HPE announced the Merger, Verizon delayed the deal because it had pending litigation against Micro Focus. As of March of 2018, when FE 2 left the Company, the deal had still not closed. FE 2 stated that this deal and many other deals were delayed because customers had pending litigation with Micro Focus. Additionally, according to FE 5 (identified in ¶44), Exxon Mobil, an HPE Software customer, told HPE Software that it did not want Micro Focus employees on its campus and that Exxon Mobil had "blacklisted" Micro Focus due to an audit of Exxon Mobil after Micro Focus acquired another company. FE 5 heard that Defendant Hsu was on calls with Exxon Mobil representatives to try to "mend the fences."

89.    Finally, following the Merger these problems affected sales of what had been HPE Software products and required Micro Focus to make extraordinary customer concessions in order to achieve even substantially reduced internal sales expectations. Specifically, during the fourth quarter of 2017, Micro Focus sales personnel that had been with HPE Software offered large discounts and extended payment terms to customers in order to "pull forward" sales. Indeed, according to channel checks by Deutsche Bank analysts discussed in their March 19, 2018 report, "HPE [Software] salespeople were offering aggressive discounts in 4Q to essentially pull forward demand from future quarters. Were favourable financing terms offered on these sales, we would expect to see higher receivables (ie clients buying software for future consumption on favourable pricing and credit terms). This suggests that future revenues may have been pulled into an already week FY2017." This meant that much of HPE Software's revenue was already pulled forward into 2017, and Micro Focus sales personnel would not be able to sell to customers that had already

received very discounted contracts. This analysis is corroborated by several former employees. According to FE 4 (identified in ¶74), who was responsible for managing a sales team in the Enterprise Security software business, discounts were being given to sell future sales in the current quarters. FE 4 confirmed that upper management told employees to pull future deals into Q4 and to do everything they could to pull sales forward.

**F.**    **Micro Focus Attempts and Fails to Implement the FAST Software Platform**

90.    Before the close of the Merger in September 2017, HPE Software was in the process of implementing the FAST software platform. Micro Focus decided before the close of the Merger to move all of Micro Focus onto the FAST platform as well, and touted FAST as the "platform for the future." However, upon moving the acquired HPE Software business onto the FAST platform shortly after the close of the Merger, problems immediately arose that prevented Micro Focus employees from adequately providing sales quotes to potential customers and creating invoices. In short, the transition to FAST was an undisclosed and unmitigated disaster that substantially impaired the proper operation and integration of HPE Software. According to FE 10 (identified in ¶87), this was because with FAST, "It was just a hurry up and get it done type of situation, so no wonder it failed." Similarly, according to FE 5 (identified in ¶44), it was the "biggest catastrophe" FE 5 had "ever experienced as a sales person in terms of back office efficiency."

91.    According to numerous former Micro Focus employees, FAST was not functional and, in fact, prevented employees from creating sales quotes for and invoicing potential clients. For example, FE 4 (identified in ¶74) stated that FE 4 was assigned to test FAST in early 2017 and gave the feedback that it was "terrible." According to FE 7 (identified in ¶75), in November and December 2017, FE 7 could not sell anything because FAST would not create a quote.

35

92.     According to FE 11, the new FAST system killed deals because it could not invoice a deal even where a customer wanted a certain product and was ready to purchase it.[16] FE 11 stated that FE 11 personally lost around half a million dollars in revenue because of the issues with FAST. That FAST prevented customers from being invoiced was also corroborated by FE 4 (identified in ¶74), who managed a sales team and stated that FAST could not process orders appropriately, so FE 4's sales team had purchase orders sitting around "that were not able to be processed and booked." FE 4 gave the example of one $130,000 order that was given to FE 4's team in October 2017, but did not get completed until the end of January 2018. When it was completed, the Company only recognized $60,000 of the deal because the systems were not set up properly and incorrect discounts were applied to the deal. FE 10 (identified in ¶87) also corroborated that sales employees were not able to provide invoicing and that the whole invoicing application had failed. According to FE 9 (identified in ¶86), salespeople could not close deals for months because the FAST system would not accept orders. FE 7 (identified in ¶75) similarly stated that FE 7 set up customers on products with temporary passwords even though they had not yet been able to buy the product, which cost the Company revenue because it did not back-charge the customer. Similarly, according to FE 11, FAST was still not working when FE 11 left the Company in April 2018.

93.     Further, according to FE 7 (identified in ¶75), FAST was also not sending out maintenance invoices, and if a customer did not receive or pay maintenance invoices, then the customer's maintenance support was cut off.

94.     According to many former Micro Focus employees, the problems created by the FAST implementation also further drove salesforce attrition that had begun at both HPE and Micro

---

[16] FE 11 was a Senior Account Manager in HPE's ADM (Automated Development Management) business starting in July 2016 and then continued in that role at Micro Focus until April 2018.

Focus before the closing of the Merger. As further corroborated by the Company's admissions at the end of the Class Period, employees recounted that the sales force attrition at Micro Focus continued and accelerated in the months following the closing of the Merger, including due to the inability to sell or service customers as a result of problems with FAST. According to FE 2 (identified in ¶44), FAST had no way to link the program in which sales employees were inputting data for their sales to the system that would pay out commissions.

95.      According to FE 11 (identified in ¶92), many salespeople quit Micro Focus to move elsewhere because they were not able to invoice their deals and, thus, were not able to get any commissions. According to FE 8 (identified in ¶86), there was a huge "exodus" of sales staff because the FAST software that Micro Focus implemented was unable to process sales quotes and purchase orders. FE 8 stated that while the program was called FAST, "it was at a dead standstill."

96.      Indeed, in 2018, accounts receivable grew by 23% year-over-year, and analysts, such as Deutsche Bank, estimated that Days Sales Outstanding grew from 81 to 108 days. As discussed in greater detail below, Micro Focus eventually admitted that these issues related to its attempts to converge Micro Focus onto FAST, which led to discounts, extension of payment terms, and customers not being billed properly. However, according to FE 7 (identified in ¶75), even though the Company realized that its problems with integration were leading to an inability to invoice customers, once the Company turned off the old sales systems, it refused to turn them back on.

97.      According to FE 10 (identified in ¶87), there were all employee meetings quarterly and FAST was a topic of conversation at these meetings. Defendant Hsu would attend these meetings and would say that he knew there were problems with FAST, but that he was positive that things would straighten themselves out. FE 10 thought that Defendant Murdoch also attended

these meetings. According to FE 10, issues with FAST were brought up after October 2017. Similarly, FE 9 (identified in ¶86) stated that the issues with FAST were discussed on an all-hands quarterly call around January 2018 that Sue Barsamian was on. On the call, employees were told that management knew there were issues with FAST, they were trying to fix the issues, and to be patient.

### G.    The Truth Emerges

#### 1.    The January 8, 2018 Partial Disclosure

98.    On Monday, January 8, 2018, before the opening of the market, the Company issued a press release and filed a Form 6-K announcing its interim results for the six months ended October 31, 2017—the first interim results since the completion of the Merger with HPE Software on September 1, 2017. The results reflected a serious and previously undisclosed deterioration of virtually every aspect of the combined Company's business, as well as problems with the integration of HPE Software and implementation of Micro Focus's brand new FAST system. The Company reported its total results, as well as results for two operating segments: the Micro Focus Product Portfolio, which contained its mature infrastructure software products, and SUSE, which included its open-source products. The acquired HPE Software business's results were reported as part of the Micro Focus Product Portfolio's results for the two months from the closing of the Merger to October 31, 2017. Because HPE Software was only part of Micro Focus for two months of the reported period, the Company also reported six-month results for the "Existing [i.e., legacy] Micro Focus Product Portfolio" and the "HPE Software Product Portfolio."

99.    Among other things, the press release and Form 6-K reported revenue of only $1.235 billion for the six-month period and adjusted EBITDA of only $530 million. The HPE Software revenue for the twelve months ended October 31, 2017 was $2.9 billion, which was at the very bottom of the prior reported guidance of $2.890 billion to $2.960 billion.

100.    Micro Focus's legacy businesses' revenue was 2.7% lower on a constant currency ("CCY"), year-over-year basis for the period; revenue from the existing Micro Focus Product Portfolio declined by 7.0% on a CCY, year-over-year basis; and the legacy Micro Focus's Adjusted EBITDA was 4.1% lower on a CCY, year-over-year basis. In addition, Micro Focus reported revenues of only $500.3 million for the six months ended October 31, 2017 in its Existing Products segment, reflecting a 7% year-over-year decline. The Company's licensing services in its Existing Products segment declined 17% during this same time, and its consultancy services in the segment declined 11.7%.

101.    The Form 6-K quoted Defendant Loosemore as admitting that the Company had "put operational improvement plans *on hold* while working on the completion of the HPE Software transaction," and the Form 6-K also attributed the Micro Focus Product Portfolio's year over year $17.3 million Adjusted EBITDA decline to "operational efficiencies [being] put on hold pending the completion of the HPE Software transaction."

102.    In addition, the Company stated in the Form 6-K that "[w]e were disappointed with sales execution primarily in our Americas region," where the Micro Focus Product Portfolio's overall revenue declined 11% and license revenue declined 31% year-over-year.

103.    The Company's Form 6-K also belatedly revealed problems caused by the spinoff of HPE Software from HPE and by the Company's implementation of its new FAST system, the internal software platform for Micro Focus's own marketing, sales, and other business functions, which were known internally from prior to the beginning of the Class Period as reported by the numerous FEs whose accounts are discussed above. FAST "went live" on November 1, 2017 for the legacy HPE Software business, and the Company admitted that "[t]he go-live process has been more challenging than anticipated due to issues related to migrated data that have taken time to

resolve. . . . The challenges associated with the carve out of the HPE Software business and the go-live on FAST *have resulted in some delays to customer and partner invoicing and cash collection in the short term with an increase in DSO* [days sales outstanding, a measure of how long customers take to pay invoices] that is anticipated to continue for a period of time."

104.   The Company also revealed that Defendant Phillips would be demoted from CFO to Director of M&A.

105.   Also on January 8, 2018, Micro Focus held a conference call with analysts and investors about the six-month results. During this call, Defendant Hsu disclosed some facts partially revealing the falsity of Defendants' prior statements, including that the combined platform was not "strong," and that the Merger had not created efficiency, but rather it had aggravated pre-existing sales and personnel problems at both HPE Software and Micro Focus. Specifically, Defendant Hsu stated that:

> a.   Legacy HPE Software revenue of $2.9 billion was down 7% year-over-year, at the lower end of Defendants' prior guidance range provided in September 2017;
>
> b.   Legacy Micro Focus revenue (including both the Micro Focus Product Portfolio and SUSE) was down 2.7% year-over-year relative to the prior guidance of "broadly flat";
>
> c.   The legacy Micro Focus Product Portfolio's revenue was down roughly 7%;
>
> d.   Contrary to the misleading representations that the Merger would *increase* EBITDA margins, Hsu admitted that "EBITDA for the Micro Focus [P]roduct [P]ortfolio was down and that is reflective largely of the

40

operational performance improvements that were put on hold while we completed the transaction with Hewlett Packard Enterprise";

e.    "[W]e have some hotspots. FAST1, anytime you do a major implementation of a system like that, there are things that don't necessarily go exactly as planned and we're working through them";

f.    "[W]hat would be expected is that there's—some of that is a little bit bumpy. And that has been the case, especially when it comes to data migration. . . . And when you actually put those into [the] system and try and run quotes or invoices, the system kicks them out"; and

g.    "[W]hat we've had to do is really build a workaround system to resolve the issues [with FAST] so that systematically they're fixed, but also to get the quotes and the invoices done so that it doesn't impact us from a revenue perspective. And as I mentioned, the teams have worked tirelessly through the holidays to really make that happen."

106.    These disclosures partially revealed the falsity of Micro Focus and the Executive Defendants' prior statements, including, for example, their statements about the "enlarged company's . . . technology innovation, global resources and a highly skilled workforce," "strong platform," and "3,000 salespeople globally"; their denials of high employee turnover and low morale; and their assertions that "[d]espite [the] complexity of [the] transaction we have continued to execute on the core business" and that "we're not disrupting the product flow into the marketplace." Indeed, Micro Focus and the Executive Defendants began to partially disclose the truth – that both HPE Software and Micro Focus were facing weakened sales and sales personnel attrition and that the integration of the Merger was, in fact, "disrupting" the business.

107.    Analysts reacted negatively to the January 8, 2018 disclosures. In a report dated January 8, 2018, Investec Securities commented that the results were "poor on revenues" and on "the near term disruption the HPE deal is causing to core Micro Focus sales traction and the integration challenges." The Investec Securities report warned: "Our main concern is playing out earlier than expected, with material top line declines coming through due to the size of the integration challenge and disruption this may cause to the focus on revenues, which the group needs considering the legacy and 'non-sticky' nature of many of its offerings." Investec issued another report on January 9, 2018, calling Micro Focus's results a "damp squib": "The reveal we had all been waiting for since the Sept 16 HPE announcement was a damp squib. . . . [W]e saw continued underperformance in core Micro Focus, no new financial information on HPE integration, tepid cash flow, and some SUSE softness. . . . Our concern is that the core Micro Focus revenue decline has been accelerating and there is little evidence as yet that HPE sales declines can stabilise medium term." The comments by Investec confirmed that the revenue trends and operational problems described by the numerous FEs quoted above were now being publicly revealed.

108.    In a report dated January 8, 2018, Numis Securities Limited highlighted the problems that were known internally at Micro Focus from the beginning of the Class Period became known to investors, specifically that HPE Software revenue "at the bottom of its guidance range . . . implies licence revenue down by approx. 30% in Q4. This reflects a combination of a tough comp as Q4-16 was the last quarter ***when software products were sold by the entire HPE Group and sold on a bundled basis . . . together with a negative impact from disruption and salesforce changes***."

42

109.     In a report dated January 8, 2018, UBS also described facts belatedly revealed to investors that FEs described as being known prior to the Merger, specifically concerning Micro Focus's "poor sales execution in the Americas." UBS issued another report on January 10, 2018, noting that the absence of bundling HPE Software products with hardware offerings contributed to poor sales "Q4 16 was the last quarter where HPE Hardware and Services was incentivized to sell software, creating a challenging comparative," and that "sales execution had been poor, especially in the Americas."

110.     In a report dated January 9, 2018, Barclays Capital Inc. wrote: "The market (and we) underestimated just how weak the HPE Software Q4 would be, and disappointing sales execution at core Micro Focus did not help. . . . Specifics on the reasons for sales slippage and mis-execution were brief and this meant that the decent guidance was somewhat discredited, in our view."

111.     Credit Suisse headlined its report dated January 9, 2018 "More questions than answers" and wrote that "we would argue that's now 18 months of disappointment for 'legacy' Micro Focus."

112.     In response to the January 8, 2018 partial corrective disclosures, Micro Focus ADSs fell $5.76 per ADS on January 8, 2018 from the prior trading day's close, or 16%, to close at $28.92, on unusually high trading volume of more than 2.5 million ADSs. This represented a ***loss of approximately $1.3 billion in the total market capitalization*** represented by the ADSs originally issued in connection with the Merger.

113.     After the Company's January 8, 2018 disclosures discussed above in ¶¶100-105, Micro Focus and the Executive Defendants continued to reassure the market of the Company's "strong platform," "proven operating model," post-merger integration, sales personnel, and

revenue expectations. For example, Defendant Hsu misleadingly stated on the January 8, 2018 conference call that:

a.  "We also believe that we have a strong platform with a proven operating model";

b.  "the transaction thesis of the HPE Software business is intact and strong";

c.  "we're only a couple months post the completion of the transaction and we've already integrated the product teams";

d.  "we believe that we have and are building a competitively advantaged platform with, number one, scale; two, a standard integration approach; efficient product and development methodologies; one modern IT platform; and the financial strength to benefit from that further industry consolidation";

e.  "one of the areas of most significant accomplishment is standing up 70% of our revenue, which is the HPE Software business which we did in November on a completely new IT system, which is a very modern system. . . . And we did that within two months post the close of the transaction. There are very few businesses that close one of the largest, most complex global mergers and then two months later, stand up 70% of the revenue on a completely new ERP [enterprise resource planning] system, transaction system, frontend and backend, and we've done that";

f.   "we have a fully integrated sales team as of November 1";

g.  "the great thing about this is that we have a very clear structure and governance process for managing the integration, for managing all the

various different investments that are being made, and that's all being driven under Stephen Murdoch's organization"; and

h.  in response to an analyst's question about "sales execution issues in Micro Focus in the last six months in the core business" and whether the Company was "getting a little bit too far": "**I'm not worried really about the speed.**"

114.  On January 31, 2018, the *London Evening Standard* reported that Investec had "decided to put the boot in" Micro Focus by cutting its rating from "hold" to "sell"; the article quoted Investec analyst Julian Yates as saying: "The scale of the [HPE Software] integration, lack of evidence that the underlying Micro Focus had stabilised and HPE's vast and largely undifferentiated software stack diluting Micro Focus differentiation concerned us. . . . Recent results underwhelmed and our concerns have escalated rather than abated."

### 2.   The March 19, 2018 Disclosure

115.  In sharp contrast to Defendants' disclosures touting the benefits of the Merger, including increased EBITDA and profit margins, on March 19, 2018, Micro Focus disclosed in a Form 6-K that the Company's revenue declines had significantly accelerated because of previously concealed problems with its new FAST system, sales-force attrition and underperformance, and post-spinoff problems marketing HPE Software products unbundled from HPE products. Specifically, the Form 6-K's "trading update for the twelve months ending 31 October 2018" disclosed:

> Since the interim results on 8 January 2018, the rate of year-on-year revenue decline has been greater than anticipated and accordingly the Group is issuing revised constant currency revenue guidance for the twelve months ending 31 October 2018 of minus 6% to minus 9% compared to the proforma 12 months ending 31 October 2017. This updates revenue guidance of minus 2% to minus 4% provided at the interim results on 8 January 2018. . . .
>
> Chris Hsu has submitted his resignation in order to spend more time with his family and pursue another opportunity. He will step down immediately as the CEO of the

company. Stephen Murdoch, currently Micro Focus COO, becomes CEO and rejoins the Board with immediate effect.

The recent revenue performance is primarily due to lower than expected licence income and is a result of a number of factors, which management believe to be largely one-off transitional effects of the combination with HPE software, rather than underlying issues with the end market or the product portfolios. These factors include:

1. Issues relating to our new IT system implementation, which have impacted the efficiency of our sales teams, our ability to transact with partners and our cash collection;

2. Higher attrition of sales personnel due to both integration and system related issues;

3. Disruption of ex Hewlett Packard Enterprise global customer accounts as a result of the demerger of Hewlett Packard Enterprise; and

4. Continued sales execution issues particularly in North America.

***

As a consequence of the factors set out above, for the six-month period ending 30 April 2018 the Group expects revenues to decline on a constant currency basis at minus 9% to minus 12% compared with the proforma comparable prior period and DSOs to remain at a temporarily elevated level.

***

Kevin Loosemore, Executive Chairman of Micro Focus International commented: "We remain confident in Micro Focus' strategy whilst recognising that operational issues have led to a disappointing short term performance and outlook. . . ."

116.    Thus, the March 19, 2018 "trading update" revealed the falsity of Defendants' prior representations concerning the effectiveness of the integration of Micro Focus and HPE Software, the combined companies' ability to sell their products, their sales personnel, and the impact of the spinoff of HPE Software from HPE. On information and belief, Defendant Hsu has not obtained full-time employment since his "resignation" from Micro Focus.

117.    Also on March 19, 2018, Micro Focus held a conference call with analysts and investors about the update. During this call, newly installed Micro Focus CFO Kennedy disclosed some facts revealing the falsity of Defendants' prior statements, including:

      a.    "Since the interim results on the 8th of January 2018, the rate of year-on-year decline has been greater than anticipated, mainly driven by license declines. In consequence, we're revising constant currency revenue guidance for the 12 months ended 31st October 2018 compared to the pro forma 12-month period ended October 2017 to the new range of minus 6% to minus 9%";

      b.    "[C]ollections remain impacted by our new IT system implementation . . .";

      c.    "We believe that the revenue decline issues are mainly due to one-off transitional effects relating to the combination with HPE Software and with not [sic] underlying issues with the end market or the product portfolios. Those key transitionary factors are the IT system, which is . . . it's called FAST. We have suffered implementation issues there, which have impacted the efficiency of our sales teams, and our ability to transact with partners and customers and our cash collection";

      d.    The "system" problems had led to elevated levels of provisions for bad debts, and the Company did not expect to "have stabilized the system" until the end of 2018;

      e.    "We're actually seeing declines across both the heritage Micro Focus and the heritage HPE side, . . . which is part of the reason why we're pointing to at least some transitionary impact, because it's happening across both

portfolios. Also, when you look across geographies, North America is disproportionately impacted. . . . So, . . . the central thesis [is] that this is not a product and portfolio issue, it's an integration and execution issue";

f.    "[W]e've had two quarters of significant [license] declines. . . . [W]e don't think the market has changed fundamentally in that period. We think our performance has";

g.    "We've had higher attrition of sales personnel due to both the integration and system-related issues, the disruption of global customers from the disaggregation of the Hewlett Packard Enterprise companies and continued sales execution issues, particularly in North America";

h.    "[A]s Stephen [Murdoch] said earlier, we did underestimate the impact of losing the influence in the big account[s] of the broader HPE cooperation . . . .";

i.     "We're giving you guidance now for the six months to April 30th, which is a decline in revenue on a constant currency basis of minus 9% to minus 12% compared to the comparable pro forma period";

j.    In response to an analyst's question about why the Company was reducing its guidance so soon after the January 2018 guidance: "what changed is that we've had revenue decline since that interim announcements [sic]. And we've outline[d] the reasons that we believe are responsible for that, which is around the ***integration, the system implementation, the HPE disruption, and the sales execution in North America***"; and

48

k.    In response to an analyst's question whether "the pace of cost-cutting has been too hard," causing the revenue declines: "The correlation between cost savings harder and revenue weakness, we believe there may be some areas of the business in some places where that could be a causal effect and we're reinvesting into certain areas of the business. . . . So we're currently embarked on hiring net new salespeople, particularly in North America. So I think your hypothesis there may have some validity in certain places."

118.    Also, on the March 19, 2018 conference call, Defendant Loosemore disclosed facts revealing the falsity of Defendants' prior statements, including:

a.    "Within North America versus the rest of the world, the revenue weakness is stronger in North America. . . . [T]he sales force attrition has been stronger in North America. In a business of this sort, you would expect general attrition normally to be at the 15% to 20% range. We've got pockets where it's been higher than that by up to 10 points and we're seeking to address those."

a.    Computer Associates and BMC, two of the Company's principal competitors in "the mature part of the infrastructure market," had revenues indicating that "the market for this kind of software is broadly flat." Thus, the fact that "our performance is worse than theirs . . . ***leads us to believe that the concerns are more of our making than of the market['s] making***."

b.    "We're currently embarking on a plan to increase the number of salespeople in the business, particularly in North America, where we will be hiring net new salespeople out to the end of the year . . . ."

    c.      "[O]n the maintenance side, it's true the difficulties in, again, with the IT system in terms of quotes has led to a delay in some of those renewals. . . . [T]he one impact we can say we have seen, which will probably be more permanent in nature is that, our ability to go after win-backs. So, this is where a customer has previously left us and we go to win that business back. ***It's sad to say that that has suffered in the first few months of this year as we deal with the issue of getting the quotes and the renewals done,*** " and this will be a "persistent impact."

    d.      "Much of the integration work is on track, but clearly, systems—some of the system stuff is behind, and that's a disappointment. . . . We do have a lot of work to do, and clearly, we have a lot of work to do to regain the confidence of the investors. And I think the share price reaction shows that there's an element of trust that needs to be rebuilt . . . ."

119.    Analysts reacted to the March 19, 2018 news with shock.

120.    Echoing many of the analyst reports published after the January 8, 2018 disclosures, in a report dated March 19, 2018, Deutsche Bank further confirmed that the problems leading to the bad news reported on March 19, 2018 were the same issues known internally at Micro Focus from before the closing of the Merger (as reflected in the numerous former employee accounts discussed above):

> While management are attributing the current problems to weak sales execution, our channel checks suggest the issues reflect a number of other concerns, ie
>
> - Customers moving from buying from ***HPE who we understand have a reputation for treating customers well and benefitted from a 'no one got fired for buying IBM' philosophy, to working with MCRO who have a reputation for license audits and increasing maintenance prices***

- Under HPE, a large number of deals **involved bundled hardware** and software, and therefore some of the software sales may not have otherwise happened on a standalone basis

- As the product set appears to have been somewhat underinvested under HPE, this now appears to be impacting sales with a lag. . . . It is therefore hard for existing customers to justify buying incremental new product from MCRO, and it is incredibly difficult to win net new customers ie to displace other mature software players.

121.    Deutsche Bank also wrote that Micro Focus made previously undisclosed and excessive cuts to the ranks of its sales force:

> [E]arly cost [savings] delivery . . . **was in part driven by aggressive cuts in sales—a wide number of expensive outside sales roles were cut and replaced by lower cost inside salespeople**. We hear that this was done somewhat uniformly, ie on the basis of account size, though for some products, even in small accounts, a certain level of outside/technical sales is generally required.
>
> Management admit that this may have been overly aggressive and that some more capacity will need to be added here, particularly in the US and at a senior level We are also concerned that the growth products may be somewhat underinvested which may be partially driving weak revenues . . . .

122.    Moreover, Deutsche Bank wrote that its channel checks "suggest that HPE SW [software] salespeople **were offering aggressive discounts in 4Q to essentially pull forward demand from future quarters. Were favourable financing terms offered on these sales, we would expect to see higher receivables (ie clients buying software for future consumption on favourable pricing and credit terms). This suggests that future revenues may have been pulled into an already weak FY17.**" This reflects that even the weak results reported on March 19 were inflated by undisclosed steep discounts and extended payment terms offered to customers in an effort to mask what would have otherwise been an even worse result.

123.    In a report dated March 20, 2018, Barclays wrote that "investors seem to have lost all faith in Micro Focus succeeding in its HPE [S]oftware integration. . . . Execution has clearly

worsened, but *all signs point to internal (rather than market) issues*, namely ERP [i.e., FAST] migration, sales churn and global account relationship."

124.    In a report dated March 20, 2018 and titled "A reality shock," Credit Suisse wrote that Micro Focus's "surprise revenue warning and CEO resignation . . . is obviously negative and there is a suggestion that costs have been cut too hard too quickly." With respect to management, Credit Suisse commented that "Chris Hsu's (CEO) departure is no surprise. That said, the 'old' management team must shoulder some responsibility."

125.    In response to the March 19, 2018 disclosure, Micro Focus ADSs fell $12.20 per ADS, or 47%, from $26.21 on March 16, 2018, to close at $14.01 on March 19, 2018, on unusually high trading volume of more than 30 million ADSs—a *loss of approximately $2.7 billion in the total market capitalization* represented by the ADSs originally issued in connection with the Merger. As the market continued to absorb the news over the next several days, Micro Focus's ADS price continued to fall on unusually high trading volume, closing at $12.99 on March 22, 2018. This represented a decline of more than 55% from the ADS closing price on the date of the Merger's close.

### H.    Post-Class Period Events

126.    Even after the Class Period, Micro Focus still had not remediated issues within the business, including issues with FAST and with sales personnel attrition. For example, on July 11, 2018, in its interim results for the six months ended April 30, 2018, Micro Focus announced that the costs required for the Merger would be $960 million instead of the $750 million previously flagged due to the company's need to "stabilize then remediate the FAST platform."

127.    The Company also announced on July 11, 2018, that due to ongoing problems with FAST, Days Sales Outstanding had further deteriorated to 104 days compared with 71 days in April of 2017.

128.     On a conference call to discuss the financial results on July 11, 2018, Micro Focus further announced that "We've got work still to do on attrition. It's still at an elevated level, and we still have hot spots within it." The Company also admitted that "our systems problems meant we weren't paying the sales reps on what they'd actually sold. We've been paying them on estimates . . . and sales reps like to be paid. So we've now worked our way through that. We think the combination of both of those things will normalize attrition over time[.]"

129.     Micro Focus also confirmed that its revenue decline of 8.7% was "significantly impacted by the transition issues that we talked about in March."

130.     Defendant Loosemore further stated with regard to the Merger that "It's a challenging transition. And if you take that we are nearly 2 years from the announcement of the transaction in September of 2016, we think we're about a year behind where we wanted to be at this stage."

## V.     VIOLATIONS OF THE EXCHANGE ACT

131.     In addition to the materially false and misleading statements and omissions alleged above, the Executive Defendants made the following materially false and misleading statements and omissions before and during the Class Period.

### A.     Pre-Class Period False and Misleading Statements

132.     Before the start of the Class Period, the Executive Defendants made materially false and misleading statements in press releases and investor and analyst conference calls concerning the reasons for and benefits of the Merger and the current state of Micro Focus's and HPE Software's operations. These false statements artificially inflated the prices of Micro Focus ADSs from the start of their trading at the beginning of the Class Period, and this inflation remained until it was partly corrected on January 8, 2018 and fully corrected on March 19, 2018, as alleged in detail in Section VII.

1.      September 7, 2016 Merger Announcement

133.    Micro Focus announced the Merger on September 7, 2016, before the start of the Class Period, and touted the Merger as creating "one of the world's largest pure-play infrastructure software companies." In materials also filed with the SEC on September 7, 2016, Micro Focus told investors that the Merger had the "***potential to deliver total shareholder returns superior to those likely to be achieved on an organic basis***" and the "***scope to improve HPE Software's profitability through the application of our disciplined operating model.***" The presentation further stated that it would be "possible to ***improve the margin delivered by HPE Software's mature software assets to the typical levels seen in Micro Focus by the end of the third full financial year following completion.***" Micro Focus announced that it would complete the Merger in the third quarter of 2017, but that in the meantime it was "Business as Usual."

134.    On an investor call on September 8, 2016, Defendant Loosemore announced that in HPE Software, Micro Focus was acquiring $3.2 billion in revenues and that Micro Focus was making this acquisition because it saw "a huge opportunity for ***efficiency improvement***" and a "mix of opportunities to consolidate, to create scale in key segments that we operate in on products which are often adjacent to what we currently do."

135.    During the September 8, 2016 investor call, Defendant Loosemore also announced that, with the Merger, Micro Focus was getting "a ***significant operational efficiency*** opportunity in terms of how we can improve the margins of the business." Loosemore further stated that "[w]e have a track record of driving efficiencies. There is nothing we need to do, which is different than what we've done in any of our previous acquisitions, it's just big and larger scale, but as we've discussed with many of you, we've been building the management team over the prior year to actually accommodate that."

136.    The statements quoted in ¶¶133-135 above were materially false and misleading because, due to the then-existing problems at both HPE Software and Micro Focus, the Merger could not create the various types of "efficienc[ies]," increasing profit margins, or other purported benefits claimed in the statements, given that (i) the companies had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other; (ii) the companies were operating independently and would not be able to test and properly implement the FAST system, which they intended to deploy immediately after the Merger, and the successful testing and implementation of which were necessary to realizing the efficiencies and noted increases in profit and EBITDA margins; (iii) the companies were both experiencing significant sales-force attrition due to customer and integration concerns that would impair the combined Company's ability to maintain revenue or achieve the growth needed to effectuate any purported benefits of the Merger; (iv) HPE Software customers did not want to renew their contracts or declined to enter into new contracts during the pendency of HPE Software's proposed Merger with Micro Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against its customers, and lack of innovation, and these factors also further contributed to HPE Software's sales-force attrition; and (vi) Micro Focus and the Executive Defendants knew that HPE Software's revenue and business would be adversely impacted by its inability to continue bundling its software with HPE products and services.

137.    In response to an analyst's question about "what additional opportunities are there from this deal and from the relationships that result," Defendant Loosemore discussed FAST, stating that "[o]n the systems side, one of the hidden opportunities for us here is that HP have already started on a process of updating their systems which actually, ironically, they started by putting systems in place for [A]utonomy, where they weren't happy with the systems. And what

they're doing is, they're completing those systems during the coming year. So the opportunity we have is to actually piggyback on the back of that. So we will be amending our plan to be a plan to how we will then roll our systems onto their system completion. So it actually provided us with effectively another opportunity to save money."

138.     Defendant Loosemore's statements quoted in ¶137 above were materially false and misleading because they omitted the material fact that the FAST program had not yet been implemented, was not adequately tested, and was highly problematic. For example, FE 4 (identified in ¶74) stated that FE 4 was assigned to test FAST in early 2017 and gave the feedback that it was "terrible."

**2.**     July 12, 2017 Preliminary Results for the Year Ended April 30, 2017

139.     On July 12, 2017, Micro Focus held an analyst and investor conference call to discuss its preliminary financial results for the fiscal quarter and year ended April 30, 2017.[17] On the call, Defendant Murdoch, who was then the Company's CEO, stated that Micro Focus was managing the integration process with "2 very significant teams; 1 on the HPE side, 1 on our side, all managed under a common governance structure, ***tracking more than 10,000 very specific tasks through to completion.***" Similarly, Defendant Loosemore stated that the Merger was expected to be completed by September 1, 2017, and that the new business would be "***fully integrate[d]" by November 1, 2017***. Further, in Micro Focus's unaudited preliminary results for the quarter and year ended April 30, 2017, Micro Focus announced that it "will do nothing that will constrain our ability to achieve organic growth and we are currently investing significant amounts on activities designed to enhance growth."

---

[17] As a result of the Merger, the fiscal year end for the Company was changed from April 30 to October 31.

140.   The statements quoted in ¶139 above were materially false and misleading because HPE Software and Micro Focus: (i) the companies were operating independently and would not be able to test and properly implement the FAST system, which they intended to deploy immediately after the Merger (which, according to FE 4 (identified in ¶74), was tested in early 2017 and which, according FE 4 was found to be "terrible"), (ii) had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, and (iii) were both experiencing significant sales force attrition due to customer and integration concerns that would impair the combined Company's ability to maintain revenue or achieve growth needed to effectuate any purported benefits of the Merger. As the Executive Defendants well knew, it was not possible for the new business to be "fully integrate[d] by November 1, 2017." These statements were also false because, as the Company later admitted, the Company had "put operational improvement plans *on hold* while working on the completion of the HPE Software transaction."

**B.     The Offering Documents**

141.   On August 4, 2017, Micro Focus filed with the SEC a registration statement on Form F-4 for the ADSs to be issued in the Merger. The Form F-4 was amended on August 15, 2017 and declared effective that same day (the "Registration Statement"). The Registration Statement was signed by Defendants Loosemore, Phillips, Murdoch, Brauckmann, Slatford, Atkins, Brown, Scheiber, Manon, and Roos. On August 22, 2017, Micro Focus filed a prospectus for the ADSs to be issued in the Merger on Form 424B3, which formed a part of the Registration Statement (the "Prospectus"). The Registration Statement and Prospectus are collectively referred to in this Complaint as the Offering Documents.

142.   The Offering Documents provided "Micro Focus' Reasons for Engaging" in the Merger, characterizing the Merger as "***a rare opportunity to achieve a significant increase***

*in Micro Focus' scale and breadth*, with the potential to *deliver enhanced Total Shareholder Returns* consistent with Micro Focus' stated objectives." Specifically, the Offering Documents stated that the Merger was expected to "*enhance Adjusted Earnings Per Share* by April 30, 2019 and thereafter, with scope for further benefits as operational improvements are realized across the Enlarged Group." The Offering Documents also stated that "[a]cquisitions are only made if the Micro Focus Board believes that they *will generate risk adjusted returns greater than the base case*."

143.    The statements quoted in ¶142 above were materially false and misleading because they omitted that: (i) HPE Software was experiencing high customer attrition and sales-force attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with a company that was about to become part of Micro Focus; (ii) Micro Focus was also experiencing increasing attrition of sales personnel; (iii) Micro Focus was experiencing declining sales, especially in North America; (iv) the companies had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other; and (v) HPE and Micro Focus were operating independently and would not be able to test and properly implement the FAST system, which they intended to deploy immediately after the Merger, and the successful testing and implementation of which were necessary to realizing the efficiencies and noted increases in profit and EBITDA margins. Given that these significant sales- and employee-attrition problems had been aggravated in the period following the announcement of the Merger (in September 2016), the Merger would not, in fact, "deliver enhanced Total Shareholder returns" or "risk adjusted returns greater than the base case."

144.     The Offering Documents also stated that the Merger would "***add a
substantial recurring revenue base to Micro Focus' existing product*** portfolio, together with
access to important new growth drivers and new revenue models."

145.     The statement quoted in ¶144 above was materially false and misleading
because HPE Software was experiencing high customer attrition and sales-force attrition due to its
spinoff from HPE. HPE Software customers did not want to renew their contracts or enter into
new contracts during the pendency of HPE Software's proposed Merger with Micro Focus due to
concerns, among others, about Micro Focus's reputation for license audits, litigation against
customers, and lack of innovation, and these factors also contributed to HPE Software's sales-
force attrition. In addition, the Executive Defendants knew that HPE Software's revenue and
business would be adversely affected by its inability to continue bundling its software with HPE
products and services. Finally, HPE Software and Micro Focus had overlapping and competing
product offerings that could not be rationalized and would compete with and cannibalize each
other, offsetting any positive effects of the Merger. Thus, the Merger would not add a "substantial"
recurring revenue base to Micro Focus.

146.     Further, the Offering Documents stated that the Merger would "***create***
significantly ***greater scale and breadth of product portfolio*** covering ***largely adjacent areas*** of
the software infrastructure market, thereby creating one of the world's largest pure-play
infrastructure software companies."

147.     The statement quoted in ¶146 above was materially false and misleading
because Micro Focus and HPE Software had overlapping products that could not be rationalized
and would compete with and cannibalize each other. As confirmed by FE 3 (identified in ¶45), it
was common knowledge that Micro Focus was not in the business of rationalizing its acquisitions

59

and, instead, left them to compete. Thus, the two companies' product portfolios were not "largely adjacent" and would not create a beneficial "breadth of product portfolio."

148.    The Offering Documents also touted significant "cost benefits" and "efficiencies" stemming from the Merger, including that:

a.    "Significant cost benefits will arise from reducing duplicated central costs, combining corporate support functions (where appropriate) and increasing efficiency across all functions";

b.    The Merger will "**accelerate operational effectiveness** over the medium term, through the alignment of best practices between Micro Focus and HPE Software in areas such as product development, support, product management, account management, and **sales force productivity**, **as well as achieving operational efficiencies** where appropriate";

c.    A benefit of the Merger was "**improved operating efficiencies** to enable HPE Software, combined with Micro Focus, to accelerate financial and operational performance";

d.    The combination would help alleviate certain "challenges" in HPE Software's "maturing infrastructure software business as part of the general market shift to cloud computing and SaaS" by separating HPE Software from HPE: "The HPE Board believed that a combination of HPE Software with Micro Focus would help address these challenges **by creating a more focused, nimble and scalable software business**, particularly given Micro Focus's historical experience with and focus on effectively managing portfolios of mature infrastructure software products";

60

e.      "[A]nticipated benefits" of the Merger included the "convergence of businesses operating in adjacent and complementary product areas in order to better serve customers as a global provider of infrastructure software and ***the improvement of the profitability of HPE Software through the application of Micro Focus' operating model"***; and

f.      The Merger would "accomplish a number of important business objectives for HPE," including "***improved operating efficiencies*** to enable HPE Software, combined with Micro Focus, to accelerate financial and operational performance."

149.    The statements quoted in ¶148 above were materially false and misleading because, as alleged above, the portfolios of HPE Software and Micro Focus were largely overlapping and Micro Focus had no plan to rationalize the combined product portfolios. Thus the Merger would not realize any "efficiencies" or "cost benefits." Further, these statements were false and misleading because the Merger and the troubled implementation of the FAST program decreased profitability and increased inefficiencies when sales personnel could not provide quotes to or invoice clients. These statements were further materially false and misleading because they omitted that: (i) HPE Software was experiencing high customer attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with Micro Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and lack of innovation; (ii) HPE Software and Micro Focus were both experiencing increasing attrition of sales personnel and thus the Merger would not "accelerate operational effectiveness" in "sales force productivity"; (iii) Micro Focus was experiencing declining sales, especially in North America ; and (iv) HPE Software's revenue and business were

adversely affected by its inability to continue bundling its software with HPE products and services.

150.    The Offering Documents also disclosed Micro Focus's financial results for the six months ended April 30, 2017, including that revenue from licensing was $311 million during that period. While this amount had declined slightly since 2016, it was still 22.1% of total net revenue from those six months. These statements were materially false and misleading because they failed to disclose the material adverse trends in Micro Focus's sales, especially in North America, and sales-force attrition affecting that revenue, as required by Item 303 of Regulation S-K.

151.    For the reasons stated in ¶150 above, Defendants' statements violated Item 303, which requires the disclosures of "known trends . . . that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues." As the SEC has emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information." The SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with *particular emphasis on the registrant's prospects for the future*." Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

152.     Disclosure of known trends and forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operation." Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

153.     As alleged in detail above at ¶¶150-51, both of these conditions were satisfied here. First, the trends of soft North American sales and sales-force attrition were known to the Executive Defendants. Second, these trends were "reasonably likely to have material effects on [Micro Focus's] financial condition or results of operation." As a direct result of this trend, Micro Focus would be dramatically affected, as the Company would and did experience a significant decline (31%) in licensing revenue.

154.     Micro Focus and the Executive Defendants also made false and misleading statements in their discussion of risks, in each of which they disclosed purported future risks that had already become manifest and would only later be belatedly disclosed as underlying causes of the extremely poor performance of the Company following the Merger. The Offering documents stated that the following risks *may* affect Micro Focus in the future:

> ***The Group's success will depend on its investment in and development of products and services that continue to meet the needs of its customers.*** [Emphasis in original.]
>
> The success of the Group depends on its ability to meet the ongoing needs of its customers by continuing to invest in and develop its products and services. ***If the Group's products and services do not meet its customers' requirements, they will seek alternative solutions, potentially resulting in the loss of new revenue opportunities and the cancellation of existing contracts.*** The Group must make long-term investments, develop, obtain and protect appropriate intellectual property and commit significant research and development and other resources before knowing whether its predictions will accurately reflect customer demand for its products, services and solutions. ***Any failure to make such investments or take***

*such action, or any failure to accurately predict customer demand, control research and development costs or execute the Group's product development strategy could harm its business and financial performance.*

155.    As discussed above, before the closing of the Merger, it was well known internally at both HPE Software and Micro Focus that numerous HPE Software customers were not and would not accept license renewals or sign new contracts following the announcement of the Merger in 2016, fearing that the software would not be kept up to date and be subject to innovation and development. In the words of many former employees, the HPE Software customers feared the effects of Micro Focus's well-known reputation as a company where "software goes to die" or as a "software hospice." *See* ¶¶45, 75. Accordingly, it was materially misleading to describe the possible failure "to invest in and develop its products and services" as a potential risk, when that risk had already transpired.

156.    The Offering Documents' risk disclosures also stated that the Merger's success would depend on the effectiveness of the Company's sales force:

> *The Group is dependent upon the effectiveness of its sales force and distribution channels to maintain and grow license, maintenance and consultancy sales.* [Emphasis in original.]
>
> The Group is dependent on the success of its sales force, and *its failure to develop the skill sets of its sales personnel may lead to poor sales performance. Furthermore, weak organizational alignment and inadequate incentivization may lead to poor performance among employees of the Group.* From time to time, the Group may make changes to the organizational structure and compensation plans of the Group's sales organizations, each of which may increase the risk of sales personnel turnover. *To the extent that the Group experiences significant turnover within its direct sales force or sales management, there is a risk that the productivity of the sales force would be negatively impacted which could lead to revenue declines. In addition, it can take time to implement new sales management plans and to effectively recruit and train new sales personnel.*

157.    The statements quoted in ¶156 above were materially false and misleading because the Merger was causing significant disruption of product flow as HPE Software was experiencing significant customer attrition and both Micro Focus and HPE Software were experiencing

significant attrition of necessary sales personnel. *See* Section IV(D). The falsity of the above statements is further confirmed by the belated disclosures in March 2018 that Micro Focus's poor results were, in part, a result of "higher attrition of sales personnel due to both integration and systems related issues." Accordingly, it was materially misleading to describe the risk associated with the "effectiveness of [the Company's] sales force" as a potential risk, when that risk had already transpired.

158.    The Offering Documents also disclosed that a key risk associated with the success of the Merger concerned integration of Micro Focus and HPE Software:

> ***Integration of HPE Software with the existing businesses carried on by the Micro Focus Group may be more time consuming and costly than anticipated.*** [Emphasis in original.]
>
> The Micro Focus Group and HPE Software currently operate and, until Closing, will continue to operate as two separate businesses. The Merger will require the integration of the businesses, and the success of the Group will depend, in part, on the effectiveness of the integration process.
>
> The key potential difficulties of combining the businesses following Closing include the following:
>
> - ***developing, operating and integrating a large number of different technology platforms and systems, in particular integrating the IT platforms of both businesses;***
>
> - coordinating and consolidating services and operations, particularly across different service areas, regulatory systems and business cultures;
>
> - ***consolidating infrastructure***, procedures, ***systems,*** facilities, accounting functions, compensation structures and other policies;
>
> - integrating the management teams and retaining and incentivizing key employees;
>
> - coordinating communications with and/or the provision of services by the Group to customers of both the Micro Focus Group and HPE Software; and
>
> - ***disruption to the businesses of each of the Micro Focus Group and HPE Software***.

159.    The statements quoted in ¶158 above were materially false and misleading because (i) HPE and Micro Focus were operating independently and had not tested and would not be able to properly implement the FAST system, which they intended to deploy immediately after the Merger, and the successful testing and implementation of which were necessary to realizing the efficiencies and noted increases in profit and EBITDA margins, and (ii) the merging companies had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, precluding a successful integration of the two businesses. Accordingly, it was materially misleading to describe the risk associated with "integration" as a potential risk, when that risk had already transpired.

## C.    September 7, 2017 Capital Markets Day

160.    On September 7, 2017, at a Capital Markets Day at the London Stock Exchange Conference Forum, attended by Defendants Hsu, Loosemore, Phillips, and Murdoch, these Defendants and Micro Focus again touted the strength of the combined Company. In written investor materials, Micro Focus stated that the "[c]ombined company is a ***strong platform*** with a ***proven operating model for managing a portfolio of scale assets and is well-positioned to benefit from consolidation.***" The presentation also stated that the combined Company's "lean operating model preserves capital and maximizes total shareholder returns ***on a sustainable basis***."

161.    With regard to integration, the presentation emphasized that "[d]espite [the] complexity of [the] transaction we have continued to execute on the core business."

162.    The statements quoted in ¶¶160-61 above were materially false and misleading because the combined platform was not "strong," the operating model was not "proven," and shareholder returns were not "sustainable," as both HPE Software and Micro Focus had been experiencing severe customer and personnel attrition before the closing of the Merger. Moreover, the statement that Micro Focus had "continued to execute on the core business" was false and

misleading because, as Micro Focus later admitted, it had been experiencing implementation problems, including problems implementing its new internal software platform (FAST), which adversely affected the efficiency of its sales team and its ability to transact with partners and customers and collect customer payments. These statements were also misleading because they omitted the material facts that: (i) HPE was losing customers due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and lack of innovation; (ii) HPE Software and Micro Focus were both experiencing increasing attrition of sales personnel, and thus the Merger would not "accelerate operational effectiveness" in "sales force productivity"; (iii) Micro Focus was also experiencing declining sales, especially in North America; and (iv) HPE Software's revenue and business were adversely affected by its inability to continue bundling its software with HPE products and services.

163.    During the September 7, 2017 investor presentation, Defendant Hsu also again emphasized that Micro Focus had a "***strong*** platform and operating model" with a "proven operating model with a world-class management team behind it" and the "***portfolio of depth and breadth to really help our customers across hybrid IT***." Hsu also stated that "[t]he strategy remains consistent. ***We've got a strong platform, proven operating model for managing a portfolio of scaled software assets.*** . . . Our strategy is to put the customers at the center of everything we do and to leverage this broad and deep portfolio we have to help them uniquely with the problems that they have across hybrid IT."

164.    The statements quoted in ¶163 above were materially false and misleading because the combined platform was not "strong" and the operating model was not "strong" or "proven," as both HPE Software and Micro Focus had been experiencing severe customer and personnel attrition before the closing of the Merger. These statements were also materially false and

misleading because Micro Focus and HPE Software had overlapping products that could not be rationalized and would compete with and cannibalize each other. Thus, the combined product portfolio did not have beneficial "depth and breadth," and there was no "proven operating model for managing [the] portfolio." These statements were also misleading because they omitted the material facts that: (i) HPE Software was experiencing high customer attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with Micro Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and lack of innovation; (ii) HPE Software and Micro Focus were both experiencing increasing attrition of sales personnel, and thus the Merger would not "accelerate operational effectiveness" in "sales force productivity"; (iii) Micro Focus was also experiencing declining sales, especially in North America ; and (iv) HPE Software's revenue and business were adversely affected by its inability to continue bundling its software with HPE products and services.

165.    During the presentation, on behalf of the Company, Micro Focus's Chief Marking Officer and General Manager of the Security Information & Governance Product Groups, John Delk, also touted the "synergies" of the Merger, stating that "[r]eally, the portfolios fit together in some really strong ways, very little overlap, and where there is overlap, a great plan for how we're going to get best of both approaches and ***get synergies out of that***, and so this will kind of be our road map for the next section."

166.    The statements quoted in ¶165 above were materially false and misleading because, as alleged above, the portfolios had substantial overlap, Micro Focus had no plan to rationalize the different products, and the products would therefore compete with and cannibalize each other. As confirmed by FE 3 (identified in ¶74), it was common knowledge that Micro Focus was not in the

business of rationalizing its acquisitions and, instead, left them to compete with each other. Thus, combining the portfolios would not produce "synergies"; the overlap was not "very little"; and Micro Focus had no "great plan" for integrating the portfolios.

167.    Analysts were excited by Micro Focus and the Executive Defendants' statements regarding the "synergies" of the combined Company. For example, Deutsche Bank noted that Defendant Hsu was "impressive and laid out a compelling vision for the company going forward." Additionally, one of Deutsche Bank's key takeaways was that ***"[t]he company sees meaningful revenue synergies from integrating [Micro Focus] and HPE [Software's] products along with the ability to offer CIO's a more complete product set.***"

168.    With regard to Micro Focus's "proven operating model and strong platform," Defendant Hsu stated that there were "***3,000 salespeople globally and 2,500 go-to-market partners***. We have 2,000 support personnel dedicated to helping our customers get the most out of the software, break-fix, etc., with industry leading NPS [Net Promotor Score (an index that measures the willingness of customers to recommend a product or services)] scores and over 2,000 professional services folks that are experts in helping our customers implement our software so they get the most out of it."

169.    Defendant Hsu also specifically denied that Micro Focus was experiencing high employee turnover and poor morale, stating that "many of you actually asked a lot of questions about turnover and employee morale in the break, and I was actually ***somewhat taken aback***. I'm in a financial community, and that was one of the first questions I got asked. But we've got to build a company that employees are excited about, want to be a part of, own and that our customers view as a strategic partner. And in a software company, ***all we have is our people***."

170.    Additionally, Defendant Hsu stated that "the number one bet that we're making this year, and it will be reflected in our financial architecture is **maintaining stability of the rep-customer relationship**, maintaining specialization in our sales organizations around the assets that we're bringing together, and we're going to capture the **synergies** and operational improvements where they . . . overlap in the leadership level and in the back office support functions. **But on the quota-carrying field and inside sales reps, we're going to maintain consistency and stability**."

171.    The statements quoted in ¶¶167-70 above were materially false and misleading because they omitted the material facts that HPE Software and Micro Focus were both experiencing increasing and material attrition of sales personnel. Multiple former employees corroborated that there was extremely high turnover at HPE Software after the announcement of the Merger, as sales personnel knew they would have great difficulty selling Micro Focus contracts to HPE Software clients given Micro Focus's reputation as overly litigious against customers and a place where "software goes to die." *See* Section IV(D). Given that sales employees would no longer be able to obtain the same number of contracts or earn the same commissions, HPE Software experienced high attrition of salespeople after the announcement of the Merger in September 2016. The falsity of Defendant Hsu's statements is further confirmed by the belated disclosure in March 2018 that Micro Focus's poor results were, in part, a result of "higher attrition of sales personnel due to both integration and systems related issues."

172.    During the September 7, 2017 investor presentation, Defendant Murdoch touted the FAST system, stating that "FAST is our integrated technology stack for the new company, and I'm going to touch on that in a moment. It's one of the **fundamental building blocks for operating the businesses effectively** as we want to in our current guise and also providing that platform for the future." Murdoch stated that Micro Focus was "moving through into the deployment of FAST1,

70

planning and execution for FAST2, and the standup of a completely stand-alone set of infrastructure in which to run that. That will then enable us to exit a period of integration and into a period of stabilization, which then opens up the flexibility for us to look again as we run this business."

173.    The statements quoted in ¶172 above were materially false and misleading because rather than increasing operational efficiencies, in reality, FAST prevented sales teams from creating quotes, processing orders, sending invoices, recording sales, and earning commissions. Moreover, since HPE and Micro Focus had been operating independently before the Merger and did not and could not test or implement the FAST system across both organizations, any purported benefits or success associated with the FAST implementation would not be achieved, and instead the implementation of FAST would be the source of major problems for the Company. The problems with FAST were admittedly a reason for Micro Focus's poor operating results; the Company's March 19, 2018 trading update attributed the Company's poor performance to "our new IT system implementation, which have impacted the efficiency of our sales team, our ability to interact with partners and out cash collection" and to "higher attrition in sales personnel due to both integration and *system related* issues."

174.    Defendant Murdoch also stated to investors that certain critical aspects of Micro Focus were not going to change: "One is our unequivocal and relentless commitment to delivering results. The second is this focus on delivering customer-centered innovation, focus on delivering a great customer experience. No wavering from that at all. The existing road maps will continue and will be delivered. *So we're not disrupting the product flow into the marketplace that were over 700 in the combined organizations last year.* We'll continue that and improve it as we go forward."

175.    The statements quoted in ¶174 above were materially false and misleading because the Merger was causing significant "disrupt[ion]" of product flow, as HPE Software was experiencing significant customer attrition, and both Micro Focus and HPE were experiencing significant attrition of necessary sales personnel. The falsity of Defendant Murdoch's statements is further confirmed by the belated disclosures in March 2018 that Micro Focus's poor results were, in part, a result of "higher attrition of sales personnel due to both integration and systems related issues."

**D.    January 8, 2018 Financial Results for the Six Months Ended October 31, 2017**

176.    On January 8, 2018, the Company reported its financial results for the six months ended October 31, 2017. In a written presentation provided to investors and filed with the SEC on January 8, 2018, the Company again repeated its claims that the combined Company was a "strong platform with a proven operating model for managing a portfolio of scale assets and [was] well-positioned to benefit from consolidation." The presentation further stated that Micro Focus's "lean operating model preserves capital and maximizes total shareholder returns on a sustainable basis."

177.    The presentation further stated that "[w]e believe we have a ***strong operational and financial model*** that can continue to scale and provide excellent returns to our shareholders." The presentation also stated that the "HPE Software transaction thesis is ***intact and strong***."

178.    The statements quoted in ¶¶176-77 above were materially false and misleading, for the reasons discussed in ¶162 above, and because they omitted that HPE Software was already experiencing significant difficulties, including disruptions in global customer accounts as a result of its separation from HPE, and that Micro Focus was also experiencing massive employee attrition. Moreover, problems with FAST were directly in contrast with the idea that Micro Focus had a "strong operational and financial model."

179.    The presentation stated that the HPE Software assets had been migrated to a "completely new state-of-the-art IT platform (FAST) from multiple, complex legacy HP systems."

180.    The statements quoted in ¶179 above were materially false and misleading because they omitted the material fact that the FAST implementation at the legacy HPE Software business prevented sales teams from creating quotes, processing orders, sending invoices, recording sales, and earning commissions. The problems with FAST were admittedly a reason for Micro Focus's poor operating results; the Company's March 19, 2018 trading update attributed the poor performance to "our new IT system implementation, which have impacted the efficiency of our sales team, our ability to interact with partners and out cash collection" and to "higher attrition in sales personnel due to both integration and *system related* issues."

181.    Also on January 8, 2018, Micro Focus held an analyst and investor conference call to discuss its second quarter 2018 financial results. Defendants Hsu, Phillips, Murdoch, Brauckmann, and Loosemore all participated in the call. As discussed in Section IV(G)(1), Micro Focus and the Executive Defendants disclosed poor financial results but continued to reassure investors that the integration was progressing as planned, including with regard to FAST. Specifically, Defendant Hsu stated that:

a.    "we're only a couple months post the completion of the transaction and *we've already integrated the product teams*";

b.    Micro Focus was "building a competitively advantaged platform with, number one, scale; two, *a standard integration approach; efficient product and development methodologies; one modern IT platform*; and the financial strength to benefit from that further industry consolidation";

c.      "if I had to say qualitatively where we are, ***I feel really good about the progress*** and heavy-lifting that the teams have done";

d.      "[w]e're executing against the detailed plan with 15 work streams and ***over 7,500 tasks have already been completed to date***. And as I mentioned, ***one of the areas of the most significant accomplishment*** is standing up 70% of our revenue, which is the HPE Software business which we did in November on a completely new IT system [FAST], which is a very modern system. And we [went from] ***roughly 600 disparate applications to 120 in a completely modern stack***. And we did that within two months post the close of the transaction. There are very few businesses that close one of the largest, most complex global mergers and then two months later, stand up 70% of the revenue on a completely new ERP system, transaction system, frontend and backend, and we've done that"; and

e.      Micro Focus had a "***fully integrated sales team as of November 1***."

182.    Defendant Hsu further assured investors that the Micro Focus/HPE Software Merger was not being forced along too quickly. Specifically, an analyst asked about sales-execution problems that Micro Focus reported and whether Micro Focus had pushed integration of the Merger too fast, asking "is there anything that you stood out and say, well, perhaps, we're getting a little bit too far? So, I guess what gives you the confidence that this is the appropriate phase in which to cut costs if you're seeing a few lumps and bumps as you go along the way?" Defendant Hsu responded:

> Yeah. It's a great question and I would say that a question that I reflect on all the time. And I was having dinner with an experienced CEO recently and I asked him that question as well, when do you know when you're going too fast or too slow in particular areas? And his response is, if you think you're going too fast, go faster.

I don't know if that answer[s] your question, but what I'm saying is that ***I'm not worried really about the speed.***

183.    The statements quoted in ¶¶181-82 above were materially false and misleading because the integration was not progressing as planned and was far from complete. Moreover, HPE Software and Micro Focus had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, precluding a successful integration of the two businesses. Additionally, FAST had not been fully implemented and prevented sales teams from creating quotes, processing orders, sending invoices, recording sales, and earning commissions. The problems with FAST were admittedly a reason for Micro Focus's poor operating results; the Company's March 19, 2018 trading update attributed the Company's poor performance in part to "our new IT system implementation, which have impacted the efficiency of our sales team, our ability to interact with partners and out cash collection" and to "higher attrition in sales personnel due to both integration and ***system related*** issues."

184.    Defendant Hsu also reassured investors that the Company was still "strong" and that the "thesis of this deal remains intact and strong" Specifically, Defendant Hsu stated that:

a.    "we believe we have a ***strong operational and financial model*** that could continue to scale, and the HPE Software transaction and the ***benefits that we're seeing from that are proof of that model***. And we believe that will in turn continue to drive excellent returns for our shareholders"; and

b.    "we believe we have ***a strong platform and proven operating model***"; and

c.    "ultimately, that efficiency plus the scale of the business and the lean operating model directly leads to sustainable shareholder returns . . . ***we believe that the thesis of this deal remains intact and strong.***"

185.    The statements quoted in ¶184 above were materially false and misleading because the Merger thesis was not "intact and strong." To the contrary, as a result of the Merger: (i) HPE Software was experiencing high customer attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with Micro Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and lack of innovation; (ii) Micro Focus was experiencing increasing attrition of sales personnel; (iii) legacy HPE Software's revenue and business were adversely affected by its inability to continue bundling its software with HPE products and services; and (iv) legacy Micro Focus and legacy HPE Software had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, precluding a successful integration of the two businesses.

## VI.    ADDITIONAL ALLEGATIONS OF MICRO FOCUS'S AND THE EXECUTIVE DEFENDANTS' SCIENTER

186.    Numerous facts in addition to those alleged above give rise to a strong inference that the Executive Defendants knew, or were reckless in not knowing, that their statements about Micro Focus's and HPE Software's viability and the progress of the integration were false and misleading or omitted material facts necessary to make the statements not misleading when made.

187.    ***First, Micro Focus's two most senior post-Merger executives – Defendants Hsu and Murdoch – were directly and personally responsible for and involved in both the pre-Merger due diligence and the Merger integration, and were thus aware of the strategic and operational problems that are detailed in this Complaint.***

188.    Defendant Hsu led the efforts at HPE Software to decouple from HPE and to integrate with Micro Focus and was, therefore, well-informed regarding the issues that emerged from decoupling HPE with HPE Software and from the Merger, including but not limited to the

attrition of customers and the attrition of sales personnel, as well as the reputational risks that HPE Software assumed by merging with Micro Focus. Specifically, in describing Defendant Hsu's role in the Merger process, Defendant Loosemore stated during the September 7, 2017 Capital Markets Day that "Chris is a fantastic operator. ***The amount of work he was getting in doing the HPE/HPI split, then spinning off the services business to CSC, then spinning off the software business to Micro Focus.***" Given Hsu's significant role in the spin off of HPE Software, the widespread nature of the employee attrition and sales problems at HPE Software are probative of his scienter. As explained above, numerous former employees confirmed that there was massive customer attrition at HPE Software after the announcement of the Merger due to the fact that customers did not want to continue their contracts or enter into a new contract for products that would be governed by Micro Focus, which was known to be a company where "software goes to die" and that was extremely litigious against its customers. *See* Section IV(D) Moreover, numerous former employees confirmed that there was significant attrition of sales personnel at HPE Software following the announcement of the Merger because sales people understood that they would not be able to bring in new deals or even renew previous deals with HPE Software as part of Micro Focus. *See id.* Additionally, FE 4 (identified in ¶74) stated that Defendant Hsu spoke at town hall meetings and told employees that if they had accounts they were at risk of losing, they should inform Hsu so he could "walk them off the ledge." Moreover, according to FE 10 (identified in ¶87), there were employee quarterly meetings after October 2017 in which Defendant Hsu would tell employees that he knew there were problems with FAST, but that he was positive they would straighten themselves out.

189.     Similarly, Defendant Murdoch led the integration efforts at Micro Focus and, therefore either knew or was reckless in not knowing about issues with FAST and the integration

of HPE Software and Micro Focus. Murdoch detailed the efforts behind Micro Focus's purported integration efforts in April 2017, stating that the integration efforts were "all managed under a common governance structure, tracking more than 10,000 very specific tasks through to completion" As discussed above, numerous former employees corroborated that there were problems with the integration of the two companies, and specifically with the FAST system being implemented to align HPE Software and Micro Focus's processes. *See* Section IV(F). In January 2018, in connection with Micro Focus's earnings announcement, Defendant Hsu noted that "the great thing about this is that we have a very clear structure and governance process for managing the integration, for managing all the various different investments that are being made, and that's all being driven under Stephen Murdoch's organization." Defendant Murdoch had been the CEO of Micro Focus before the Merger and remained the CEO until the Merger closed. Additionally, upon Defendant Hsu's "resignation" in March 2018, Defendant Murdoch became the CEO again. Given Defendant Murdoch's significant involvement in the Merger, he knew or was reckless in not knowing about the significant attendant issues.

190. In addition, in the Offering Documents, as alleged above, both Micro Focus and HPE purported to have conducted extensive and detailed due diligence in connection with the Merger. Defendants Hsu and Murdoch were personally involved in those processes, which would have alerted them to the underlying issues that were belatedly disclosed at the end of the Class Period.

191. ***Second, the termination of Defendant Hsu, who led the Merger efforts, is probative of scienter.*** Defendant Hsu's role in Micro Focus's fraud is further confirmed by the circumstances of his resignation from Micro Focus immediately upon the Company's disclosure of Micro Focus's problematic integration of HPE Software and the worsening issues of sales and

sales personnel attrition in both businesses. As explained below, the *only* plausible inference raised by Defendant Hsu's resignation is that he engaged in misconduct that resulted in material financial detriment to Micro Focus.

192.    While the Company announced that Defendant Hsu had "resigned," the facts of his resignation make clear that Defendant Hsu was terminated. First, Hsu "resigned" only five months after the closing of the Merger and after he became CEO. Second, the Company announced on its March 19, 2018 analyst call that while Hsu effectively gave six months' notice under the terms of his contract, he "left the business immediately." Third, in "resigning" so abruptly, Defendant Hsu walked away from potentially millions of dollars in compensation. Tellingly, in response to an analyst question about whether Defendant Hsu was "walking away from his bonus and options" and whether investors should "consider . . . that off the table with regards to potential payout later," Defendant Loosemore responded that "I think it's fair to say that *all bonuses and stock options are likely to fall away*." Defendant Hsu's resignation and "walking away" from his bonus is especially probative of scienter given that Hsu was eligible for a bonus of up to 150% of his base salary, which was $1 million. Fourth, Defendant Hsu's resignation was disclosed at the same time that the Company disclosed poor financial results as well as operations issues stemming from the Merger, with which Defendant Hsu was highly involved. Hsu's departure was sudden, unexpected, and not fully explained.

193.    ***Third, Defendant Phillips' demotion is indicative of scienter.*** Defendant Phillips' role in Micro Focus's fraud is further confirmed by the circumstances of his demotion from CFO to Director of M&A at the same time that the Company announced that the "EBITDA for the Micro Focus [P]roduct [P]ortfolio was down and that is reflective largely of the operational performance improvements that were put on hold [as a result of the Merger]." As UBS noted in an

analyst report on January 8, 2018, this was a "surprise" to investors, and Barclays analysts noted on January 9, 2018 that Defendant Phillips' demotion was "perhaps contributing to the share price decline." Defendant Phillips, as CFO, had primary responsibility for managing the Company's finances. His demotion, at the same time as the truth began to emerge about the fraud, and at a time when the announcement could only lead to greater investor concerns, is probative of his scienter.

194.     *Fourth, Micro Focus touted the Merger as a "rare opportunity" and "a huge opportunity for efficiency improvement."* Given the importance of the Merger to Micro Focus's financial well-being and attractiveness to investors, the Executive Defendants were aware or recklessly disregarded the intensification of issues with personnel attrition and sales in both Micro Focus and HPE Software due to issues stemming from the Merger and to significant problems stemming from the implementation of FAST. Indeed, the viability and progression of the Merger was a subject of intense market scrutiny and concern, and a topic on which the Executive Defendants made numerous public statements during the Class Period. Given the importance of this event, analysts asked about it during conference calls and commented on it in their analyst reports. The Executive Defendants were, at a minimum, reckless in making their statements about the Merger and failing to disclose the serious integration problems Micro Focus was experiencing.

195.     *Fifth, the Executive Defendants were focused on staff attrition, with Defendant Hsu telling analysts that "all we have is our people."* The Executive Defendants were focused on maintaining stability in the sales personnel during the Class Period and made repeated statements to investors regarding that topic. These statements included Defendant Hsu's statement on a September 7, 2017 Capital Markets Day call that he was "taken aback" by rumors about employee turnover and low morale and that "all we have is our people." Additionally, on the same call, on

which Defendant Loosemore, Defendant Phillips, and Defendant Murdoch also participated, Defendant Hsu told investors that what would be "reflected in our financial architecture" is "maintaining stability of the rep-customer relationship" and "on the quota-carrying field and inside sales reps, we're going to maintain consistency and stability." The Executive Defendants were, at a minimum, reckless in making their statements about the sales force and failing to disclose the serious sales-personnel attrition Micro Focus was experiencing.

196.     *Sixth, sales, integration of the two companies, and implementation of the FAST system were core to the operations of both Micro Focus and HPE Software and were significant components of their revenue and growth and, as a result, the Executive Defendants were aware of or recklessly disregarded the customer attrition and sales-personnel attrition.* As with the success of the Merger integration efforts, the Executive Defendants made numerous public statements during the Class Period regarding the Merger's "meaningful revenue synergies," as well as the Company's reliance on its salespeople. The Executive Defendants were, at a minimum, reckless in making these statements and failing to disclose the significant issues that HPE Software and Micro Focus were both experiencing even before the Merger closed.

197.     *Seventh, numerous former employees corroborated the existence of widespread issues in Micro Focus and HPE Software's core business operations before and after the close of the Merger, all of which were known to or recklessly ignored by the Executive Defendants, including: (i) salesperson attrition-related issues at HPE Software and Micro Focus; (ii) customer attrition at HPE Software; (iii) the failure of the new FAST system and ensuing sales problems; and (iv) HPE customer concerns about support, innovation, and license audits following the announcement of the Merger.* Further, numerous former employees corroborated that the Merger was merely a way to "put a dress on a pig" and aggravated existing issues at both

Micro Focus and HPE Software. Numerous former employees corroborated that both Micro Focus and HPE Software were facing severe issues in sales personnel retention before the closing of the Merger and that HPE Software was facing massive customer attrition. On the HPE Software side, former employees corroborated that customers cancelled their HPE Software contracts or did not want to renew or sign new contracts once they understood that their new contracts would be under Micro Focus, a litigious company where software "goes to die." *See* Section IV(D). Moreover, numerous former employees corroborated that HPE Software experienced massive attrition of its sales personnel, who knew that they would be unable to sell new products and thus obtain their required commissions. *See id.* At the same time, according to former employees, Micro Focus was also facing severe personnel attrition. Moreover, while Micro Focus and the Executive Defendants touted the Merger for its "synergies," including that both Micro Focus and HPE Software were in the process of being placed on the same platform, FAST, to create efficiencies, the Merger worsened issues at both companies. According to numerous former employees: (i) sales personnel and customer attrition only continued to increase after the close of the Merger; and (ii) FAST made it nearly impossible for sales personnel to transact business, by significantly impeding their ability to provide quotes to or invoice customers. *See* Section IV(F). That these issues affecting the core components of both HPE Software and Micro Focus were widespread and corroborated by numerous former employees is further evidence of scienter, and the Executive Defendants knew or were reckless in not knowing that their statements regarding personnel, benefits of the Merger, and the progress of integration were false and misleading.

198.    ***Eighth, as alleged above, the Executive Defendants spoke repeatedly and extensively to investors about the very subject matters of the fraud – integration, FAST, sales force retention, and rationalization of the companies' product portfolios – and are presumed to***

*have spoken on these topics with personal knowledge of the true facts on those subjects.* These types of repeated, detailed public comments – through which the Executive Defendants held themselves out as knowledgeable on these subjects – further support a strong inference of scienter. The Executive Defendants either spoke on these subjects with knowledge on the topics – making their statements knowingly false – or failed to investigate or inquire as to the true facts underlying their statements – making their statements recklessly false.

199.   *Ninth, both HPE and Micro Focus's past experience with failed or problematic mergers put Micro Focus and the Executive Defendants on notice of the potential issues, pitfalls, and problems that arose in the Merger.* Micro Focus and HPE had previously experienced difficulties and disappointments in attempting to integrate other companies. As discussed above, a Credit Suisse analyst noted in reference to Micro Focus's failed acquisitions of Borland, TAG and Compuware that "this is not the first time [Micro Focus] has underestimated a transaction and cut costs too hard too quickly." HPE had a similarly bad experience with the Autonomy acquisition. These experiences acted as "red flags" putting the Executive Defendants on notice of the problems that undermined the truth and candor of their public statements during the Class Period.

## VII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS

200.   The Executive Defendants' wrongful conduct, as alleged in this Complaint, directly and proximately caused the economic losses suffered by Lead Plaintiff and the Class.

201.   During the Class Period, Lead Plaintiff and the Class purchased or otherwise acquired Micro Focus ADSs at artificially inflated prices and were damaged thereby. That artificial inflation in Micro Focus's ADS price was removed when the Executive Defendants' misrepresentations and omissions made to the market, and the misrepresentations' and omissions' effects, were revealed, causing investors' losses.

202.    Micro Focus and the Executive Defendants' fraudulent scheme was partly revealed to investors beginning on Monday, January 8, 2018, before the opening of the market, when the Company issued a press release and filed a Form 6-K announcing its interim results for the six months ended October 31, 2017. Micro Focus also held an analyst conference call on the same day. As discussed in detail in Section IV(G)(1) above, the press release, Form 6-K, and conference call disclosed, among other things, disappointing revenue for both legacy Micro Focus and legacy HPE Software, problems caused by FAST, and problems caused by the spinoff of HPE Software from HPE.

203.    These disclosures partially revealed the falsity of Micro Focus and the Executive Defendants' prior statements quoted in ¶¶133-174 above, including, for example, their statements about the "enlarged company's . . . technology innovation, global resources and a highly skilled workforce," "strong platform," and "3,000 salespeople globally"; their denials of high employee turnover and low morale; their assertions that "[d]espite [the] complexity of [the] transaction we have continued to execute on the core business"; and their statement that "we're not disrupting the product flow into the marketplace."

204.    Analysts reacted negatively to the January 8, 2018 disclosures, as discussed above in Section IV(G)(1).

205.    In response to the January 8, 2018 partial corrective disclosures, Micro Focus ADSs fell $5.76 per ADS on January 8, 2018 from the prior trading day's close, or 16%, to close at $28.92, on unusually high trading volume of more than 2.5 million ADSs.

206.    The January 8, 2018 disclosures were insufficient on their own to fully remove the inflation from Micro Focus's ADS price, because they only partially revealed the risks and conditions that had been concealed from investors. The corrective impact of the disclosures was,

moreover, tempered by Micro Focus and the Executive Defendants' continued misstatements and omissions about the Company's "strong platform," "proven operating model," post-merger integration, sales personnel, and revenue expectations. For example, Defendant Hsu misleadingly stated on the January 8, 2018 conference call that:

a.    "We also believe that we have a strong platform with a proven operating model";

b.    "the transaction thesis of the HPE Software business is intact and strong";

c.    "we're only a couple months post the completion of the transaction and we've already integrated the product teams";

d.    "we believe that we have and are building a competitively advantaged platform with, number one, scale; two, a standard integration approach; efficient product and development methodologies; one modern IT platform; and the financial strength to benefit from that further industry consolidation";

e.    "one of the areas of most significant accomplishment is standing up 70% of our revenue, which is the HPE Software business which we did in November on a completely new IT system, which is a very modern system. . . . And we did that within two months post the close of the transaction. There are very few businesses that close one of the largest, most complex global mergers and then two months later, stand up 70% of the revenue on a completely new ERP system, transaction system, frontend and backend, and we've done that";

f.  Despite the "bumpy" rollout of FAST, "what we've had to do is really build a workaround system to resolve the issues so that systematically they're fixed, but also to get the quotes and the invoices done so that it doesn't impact us from a revenue perspective. And as I mentioned, the teams have worked tirelessly through the holidays to really make that happen";

g.  "we have a fully integrated sales team as of November 1";

h.  "the great thing about this is that we have a very clear structure and governance process for managing the integration, for managing all the various different investments that are being made, and that's all being driven under Stephen Murdoch's organization"; and

i.  in response to an analyst's question about "sales execution issues in Micro Focus in the last six months in the core business" and whether the Company was "getting a little bit too far": "I'm not worried really about the speed."

207.  These continued misrepresentations and omissions continued to maintain the prices of Micro Focus's ADSs at levels that were artificially inflated, inducing members of the Class to continue purchasing Micro Focus ADSs even after the January 8, 2018 disclosures. Further price declines that caused additional injury to the Class occurred upon the disclosure of additional information about Micro Focus's previously concealed problems on March 19, 2018.

208.  The final corrective disclosure on March 19, 2018, the last day of the Class Period, revealed the Executive Defendants' fraudulent scheme to the market. On that day, the Company filed a Form 6-K before the opening of trading, and Micro Focus also held an analyst conference call. As discussed in detail in Section IV(G)(2) above, the Form 6-K and conference call disclosed, among other things, that the Company's revenue declines had significantly accelerated because of

previously concealed problems with its new FAST IT system, sales-force attrition and underperformance, and post-spinoff problems marketing HPE Software products unbundled from HPE products.

209.    Thus, the March 19, 2018 disclosures revealed the falsity of Defendants' prior representations concerning the effectiveness of the integration of Micro Focus and HPE Software, the combined companies' ability to sell their products, their sales personnel, and the impact of the spinoff of HPE Software from HPE.

210.    Analysts reacted negatively to these disclosures, as discussed above in Section IV(G)(2).

211.    In response to the March 19, 2018 disclosure, Micro Focus ADSs fell $12.20 per ADS, or 47%, to close on March 19, 2018 to close at $14.01 that day, on unusually high trading volume of more than 30 million ADSs. As the market continued to absorb the news over the next several days, Micro Focus's ADS price continued to fall on unusually high trading volume, closing at $12.99 on March 22, 2018, representing a decline of more than 55% from the ADS closing price on the date of the Merger's close.

212.    As a result of their purchases of Micro Focus ADSs during the Class Period and the corrections removing the artificial inflation in the prices paid for those securities, Lead Plaintiff and the Class suffered economic harm under the federal securities laws.

## VIII.   PRESUMPTION OF RELIANCE

213.    At all relevant times, the market for Micro Focus ADSs was an efficient market for the following reasons, among others.

214.    Micro Focus's ADSs met the requirements for listing, and were listed and actively traded on the NYSE, a highly liquid, efficient and automated market.

215.    As a regulated issuer, Micro Focus filed periodic public reports with the SEC and the NYSE.

216.    Micro Focus regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

217.    Micro Focus was followed by the news media and by multiple securities analysts employed by major brokerage firm who wrote reports, which were distributed to the sales force and customers of their respective brokerage firm. Each of these reports was publicly available and entered the public marketplace. Indeed, 94 analyst reports on Micro Focus were published during the Class Period.

218.    At all relevant times during the Class Period, the price of Micro Focus ADSs (traded on the NYSE) moved in strict correlation with the price of Micro Focus shares (traded on the London Stock Exchange).

219.    Micro Focus ADSs were actively traded throughout the Class Period, with substantial trading volume and average weekly turnover and high institutional-investor participation.

220.    As a result of the foregoing, the market for Micro Focus's ADSs promptly digested current information regarding Micro Focus from all publicly available sources and reflected that information in the price of Micro Focus's ADSs. Under these circumstances, all purchasers of Micro Focus's ADSs during the Class Period suffered similar injury through their purchase of Micro Focus's ADSs at artificially inflated prices and the presumption of reliance applies.

221.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' Exchange Act claims are grounded on Micro Focus and the Executive Defendants' material false and misleading omissions. Because this action involves these Defendants' failure to disclose material adverse information regarding the well-being of HPE Software's and Micro Focus's operations and the progress of the integration—information that these Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the viability of Micro Focus and HPE Software before the merger and their ability to integrate the two companies quickly and without issues, that requirement is satisfied here.

## IX.    VIOLATIONS OF THE SECURITIES ACT

222.    Plaintiff's claims under the Securities Act do not sound in fraud, and Plaintiff expressly disavows and disclaims any allegations of fraud, scheme, or intentional conduct as part of its claims under the Securities Act. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Lead Plaintiff's claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that the allegations do not allege fraud, scienter, or intent of the Defendants to defraud Lead Plaintiff or members of the Class.

223.    As discussed below, Micro Focus, the Director Defendants, and Defendants Loosemore, Phillips, Murdoch, Brauckmann, and Hsu made materially untrue statements and omissions of material facts in Micro Focus's Offering Documents for the Company's Merger with HPE Software.

224.   As stated above in ¶141, the Registration Statement was signed by Defendants Loosemore, Phillips, Murdoch, Brauckmann, Slatford, Atkins, Brown, Scheiber, Manon, and Roos. The Offering Documents stated with Defendant Hsu's and Defendant Schultz's consent that they would become Directors of Micro Focus at the close of the Merger.

225.   The Offering Documents provided "Micro Focus' Reasons for Engaging" in the Merger, characterizing the Merger as "*a rare opportunity to achieve a significant increase in Micro Focus' scale and breadth*, with the potential to *deliver enhanced Total Shareholder Returns* consistent with Micro Focus' stated objectives." Specifically, the Offering Documents stated that the Merger was expected to "*enhance Adjusted Earnings Per Share* by April 30, 2019 and thereafter, with scope for further benefits as operational improvements are realized across the Enlarged Group." The Offering Documents also stated that "[a]cquisitions are only made if the Micro Focus Board believes that they *will generate risk adjusted returns greater than the base case*."

226.   The statements quoted in ¶225 above were materially false and misleading because they omitted that: (i) HPE Software was experiencing high customer attrition and sales-force attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with a company that was about to become part of Micro Focus; (ii) Micro Focus was also experiencing increasing attrition of sales personnel; (iii) Micro Focus was experiencing declining sales, especially in North America; (iv) the companies had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other; and (v) HPE and Micro Focus were operating independently and would not be able to test and properly implement the FAST system, which they intended to deploy immediately after the Merger, and the successful testing and implementation of which were

necessary to realizing the efficiencies and noted increases in profit and EBITDA margins. Given that these significant sales- and employee-attrition problems had been aggravated in the period following the announcement of the Merger (in September 2016), the Merger would not, in fact, "deliver enhanced Total Shareholder returns" or "risk adjusted returns greater than the base case."

227.    The Offering Documents also stated that the Merger would "**add a substantial recurring revenue base to Micro Focus' existing product** portfolio, together with access to important new growth drivers and new revenue models."

228.    The statement quoted in ¶227 above was materially false and misleading because HPE Software was experiencing high customer attrition and sales-force attrition due to its spinoff from HPE. HPE Software customers did not want to renew their contracts or enter into new contracts during the pendency of HPE Software's proposed Merger with Micro Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and a lack of innovation, and these factors also contributed to HPE's sales-force attrition. In addition, HPE Software's revenue and business was adversely affected by its inability to continue bundling its software with HPE's products and services. Finally, HPE Software and Micro Focus had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, mitigating any positive effects of the Merger. Thus, the Merger would not add a "substantial" recurring revenue base to Micro Focus.

229.    Further, the Offering Documents stated that the Merger would "**create** significantly **greater scale and breadth of product portfolio** covering **largely adjacent areas** of the software infrastructure market, thereby creating one of the world's largest pure-play infrastructure software companies."

230. The statements quoted in ¶229 above were materially false and misleading because Micro Focus and HPE Software had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other. As confirmed by FE 3 (identified in ¶45), it was common knowledge that Micro Focus was not in the business of rationalizing its acquisitions and, instead, left them to compete. Thus, the two companies' product portfolios were not "largely adjacent" and would not create a beneficial "breadth of product portfolio."

231. The Offering Documents also touted significant "cost benefits" and "efficiencies" stemming from the Merger, including that:

    a.    "Significant cost benefits will arise from reducing duplicated central costs, combining corporate support functions (where appropriate) and increasing efficiency across all functions";

    b.    The Merger will "***accelerate operational effectiveness*** over the medium term, through the alignment of best practices between Micro Focus and HPE Software in areas such as product development, support, product management, account management, and ***sales force productivity***, ***as well as achieving operational efficiencies*** where appropriate";

    c.    A benefit of the Merger was "***improved operating efficiencies*** to enable HPE Software, combined with Micro Focus, to accelerate financial and operational performance";

    d.    The combination would help alleviate certain "challenges" in HPE Software's "maturing infrastructure software business as part of the general market shift to cloud computing and SaaS" by separating HPE Software

from HPE: "The HPE Board believed that a combination of HPE Software with Micro Focus would help address these challenges *by creating a more focused, nimble and scalable software business*, particularly given Micro Focus's historical experience with and focus on effectively managing portfolios of mature infrastructure software products";

e.     "[A]nticipated benefits" of the Merger included the "convergence of businesses operating in adjacent and complementary product areas in order to better serve customers as a global provider of infrastructure software and *the improvement of the profitability of HPE Software through the application of Micro Focus' operating model"*; and

f.     The Merger would "accomplish a number of important business objectives for HPE," including "*improved operating efficiencies* to enable HPE Software, combined with Micro Focus, to accelerate financial and operational performance."

232.   The statements quoted in ¶231 above were materially false and misleading because, as alleged above, the portfolios of HPE Software and Micro Focus were largely overlapping and Micro Focus had no plan to rationalize the combined product portfolios. Thus the Merger would not realize any "efficiencies" or "cost benefits." Further, these statements were false and misleading because the Merger and the troubled implementation of the FAST program decreased profitability and increased inefficiencies when sales personnel could not provide quotes to or invoice clients. These statements were further materially false and misleading because they omitted that: (i) HPE Software was experiencing high customer attrition due to its spinoff from HPE and the fact that customers were uninterested in continuing or creating contracts with Micro

Focus due to concerns, among others, about Micro Focus's reputation for license audits, litigation against customers, and lack of innovation; (ii) HPE Software and Micro Focus were both experiencing increasing attrition of sales personnel and thus the Merger would not "accelerate operational effectiveness" in "sales force productivity"; (iii) Micro Focus was experiencing declining sales, especially in North America ; and (iv) HPE Software's revenue and business were adversely affected by its inability to continue bundling its software with HPE products and services.

233.    The Offering Documents also disclosed Micro Focus's financial results for the six months ended April 30, 2017, including that revenue from licensing was $311 million during that time period. While this amount had declined slightly since 2016, it was still 22.1% of total net revenue from those six months. These statements were materially false and misleading because they failed to disclose the material adverse trends in Micro Focus's sales, especially in North America, and sales-force attrition affecting that revenue, as required by Item 303 of Regulation S-K.

234.    As discussed above, disclosure of known trends and forward-looking information concerning the registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operation." As alleged in detail above in ¶233, both of these conditions were satisfied here. First, the trends of soft North American sales and sales-force attrition were known. Second, these trends were "reasonably likely to have material effects on [Micro Focus's] financial condition or results of operation." As a direct result of these trends, Micro Focus would be dramatically affected, as the Company would and did experience a significant decline (31%) in licensing revenue.

235.     The Offering Documents also included false and misleading statements in their

discussion of risks, in each of which they disclosed purported future risks that had already become

manifest and would only later be belatedly disclosed as underlying causes of the extremely poor

performance of the Company following the Merger. The Offering Documents stated that the

following risks *may* affect Micro Focus in the future:

> ***The Group's success will depend on its investment in and development of
> products and services that continue to meet the needs of its customers.*** [Emphasis
> in original.]
>
> The success of the Group depends on its ability to meet the ongoing needs of its
> customers by continuing to invest in and develop its products and services. ***If the
> Group's products and services do not meet its customers' requirements, they will
> seek alternative solutions, potentially resulting in the loss of new revenue
> opportunities and the cancellation of existing contracts.*** The Group must make
> long-term investments, develop, obtain and protect appropriate intellectual property
> and commit significant research and development and other resources before
> knowing whether its predictions will accurately reflect customer demand for its
> products, services and solutions. ***Any failure to make such investments or take
> such action, or any failure to accurately predict customer demand, control
> research and development costs or execute the Group's product development
> strategy could harm its business and financial performance.***

236.     As discussed above, before the closing of the Merger, it was well known internally

at both HPE and Micro Focus that numerous HPE customers were not and would not accept license

renewals or sign new contracts following the announcement of the Merger in 2016, fearing that

the software would not be kept up to date and be subject to innovation and development. In the

words of many former employees, the HPE customers feared the effects of Micro Focus's well-

known reputation as a company where "software goes to die" or as a "software hospice."

Accordingly, it was materially misleading to describe the possible failure "to invest in and develop

its products and services" as a potential risk, when that risk had already transpired.

237.     The Offering Documents' risk disclosures also stated that the Merger's success

would depend on its sales force's effectiveness:

***The Group is dependent upon the effectiveness of its sales force and distribution channels to maintain and grow license, maintenance and consultancy sales.*** [Emphasis in original.]

The Group is dependent on the success of its sales force, and ***its failure to develop the skill sets of its sales personnel may lead to poor sales performance. Furthermore, weak organizational alignment and inadequate incentivization may lead to poor performance among employees of the Group.*** From time to time, the Group may make changes to the organizational structure and compensation plans of the Group's sales organizations, each of which may increase the risk of sales personnel turnover. ***To the extent that the Group experiences significant turnover within its direct sales force or sales management, there is a risk that the productivity of the sales force would be negatively impacted which could lead to revenue declines. In addition, it can take time to implement new sales management plans and to effectively recruit and train new sales personnel.***

238.    The statements quoted in ¶237 above were materially false and misleading because the Merger was causing significant disruption of product flow as HPE Software was experiencing significant customer attrition and both Micro Focus and HPE Software were experiencing significant attrition of necessary sales personnel. The falsity of the above statements is further confirmed by the belated disclosure in March 2018 that Micro Focus's poor results were, in part, a result of "higher attrition of sales personnel due to both integration and systems related issues." Accordingly, it was materially misleading to describe the risk associated with the "effectiveness of [the Company's] sales force" as a potential risk, when that risk had already transpired.

239.    The Offering Documents also disclosed that a key risk associated with the success of the Merger concerned integration of Micro Focus and HPE Software:

***Integration of HPE Software with the existing businesses carried on by the Micro Focus Group may be more time consuming and costly than anticipated.*** [Emphasis in original.]

The Micro Focus Group and HPE Software currently operate and, until Closing, will continue to operate as two separate businesses. The Merger will require the integration of the businesses, and the success of the Group will depend, in part, on the effectiveness of the integration process.

The key potential difficulties of combining the businesses following Closing include the following:

- ***developing, operating and integrating a large number of different technology platforms and systems, in particular integrating the IT platforms of both businesses;***

- coordinating and consolidating services and operations, particularly across different service areas, regulatory systems and business cultures;

- ***consolidating infrastructure***, procedures, ***systems,*** facilities, accounting functions, compensation structures and other policies;

- integrating the management teams and retaining and incentivizing key employees;

- coordinating communications with and/or the provision of services by the Group to customers of both the Micro Focus Group and HPE Software; and

- ***disruption to the businesses of each of the Micro Focus Group and HPE Software***.

240.    The statements quoted in ¶239 above were materially false and misleading because (i) HPE and Micro Focus were operating independently and had not tested and would not be able to properly implement the FAST system, which they intended to deploy immediately after the Merger, and the successful testing and implementation of which were necessary to realizing the efficiencies and noted increases in profit and EBITDA margins, and (ii) the merging companies had overlapping and competing product offerings that could not be rationalized and would compete with and cannibalize each other, precluding a successful integration of the two businesses. Accordingly, it was materially misleading to describe the risk associated with "integration" as a potential risk, when that risk had already transpired.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

241.    Micro Focus's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

242.    Defendants are also liable for any false or misleading forward-looking statements pleaded in this Complaint because, at the time, each statement was made, the speaker knew the

statement was false or misleading and the statement was authorized or approved by an executive officer of Micro Focus who knew the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be assumptions underlying or relating to any plan, projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    CLASS ACTION ALLEGATIONS

243.    Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or acquired Micro Focus ADSs pursuant or traceable to the Company's Registration Statement and Prospectus (Registration No. 333-219678) issued in connection with the Merger (the "Class") and persons who purchased or acquired Micro Focus ADSs on the open market between September 1, 2017 and March 19, 2018. Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

244.    The members of the Class are so numerous that joinder of all members is impracticable. Micro Focus ADSs are actively traded on the NYSE under the ticker symbol "MFGP" and millions of ADSs were traded between September 1, 2017 and March 19, 2018. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Micro Focus of its transfer agent and may be notified of the pendency of

this action by mail, using a form of notice similar to that customarily used in securities class actions.

245.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of in this Complaint.

246.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

247.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a. Whether Defendants violated the Securities Act or the Exchange Act;

   b. Whether Defendants omitted or misrepresented material facts;

   c. Whether Defendants made false or misleading statements;

   d. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   e. Whether the Executive Defendants acted with scienter;

   f. Whether the Executive Defendants or Director Defendants are individually liable for the alleged misrepresentations and omissions described in this Complaint;

   g. Whether the prices of Micro Focus ADSs were artificially inflated;

   h. Whether Defendants' misconduct caused the members of the Class to sustain damages; and

i.    The extent of damages sustained by the Class members and the appropriate measure of damages.

248.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.    CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against Micro Focus and the Executive Defendants

249.    Lead Plaintiff repeats and realleges every allegation contained above as if fully alleged in this Count.

250.    During the Class Period, Defendant Micro Focus and the Executive Defendants carried out a plan, scheme, and course of conduct, which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged in this Complaint, and (ii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Micro Focus's ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions alleged in this Complaint.

251.    Defendant Micro Focus and the Executive Defendants (i) employed devices, schemes, and artifices to defraud, (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading, and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and

other acquirers of the Company's ADSs in an effort to maintain artificially high market prices for Micro Focus's ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

252.    Defendant Micro Focus and the Executive Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce and of the mails, including the NYSE, a national securities exchange, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, prospects, employee attrition, and customer attrition.

253.    During the Class Period, Micro Focus and the Executive Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

254.    Defendant Micro Focus is liable for all materially false and misleading statements made by it during the Class Period.

255.    Defendant Micro Focus is further liable for the false and misleading statements made by Micro Focus officers during conference calls and at conferences with investors and analysts, as alleged above, as the maker of these statements under the principle of respondeat superior.

256.    Additionally, the Executive Defendants, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of in this Complaint. The Executive Defendants are also liable for the false and misleading statements they personally made or signed.

257.    Micro Focus and the Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this Complaint, or recklessly disregarded the true facts that were available to them. Micro Focus and the Executive Defendants engaged in this misconduct to conceal Micro Focus's true condition from the investing public and to support the artificially inflated prices of the Company's ADSs.

258.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Micro Focus's ADSs. Plaintiff and the Class would not have purchased or otherwise acquired these securities at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Micro Focus's and the Executive Defendants' fraudulent course of conduct.

259.    As a direct and proximate result of Micro Focus's and the Executive Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered economic loss and damages from their purchases or other acquisitions and sales of the Company's ADSs during the Class Period, as the prior artificial inflation in the price of these securities was removed over time.

260.    By virtue of the foregoing, Micro Focus and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Executive Defendants**

261.    Lead Plaintiff repeats and realleges every allegation above as if fully alleged in this Count.

262.    The Executive Defendants acted as controlling persons of Micro Focus within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, intimate knowledge of the Company's actual performance, and power to control

public statements about Micro Focus, the Executive Defendants had the power and ability to control the actions of Micro Focus and its employees, and to cause the Company to engage in the wrongful conduct alleged in this Complaint. Each of these Defendants was able to and did control, directly and indirectly, the content of the public statements made by Micro Focus during their tenures at Micro Focus during the Class Period, which include Micro Focus's false and misleading statements contained in the statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged in this Complaint.

263.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Executive Defendants had direct involvement in the day-to-day operations of the Company. The Executive Defendants were directly involved in certifying or approving the false statements disseminated by Micro Focus during the Class Period. As a result of the foregoing, the Executive Defendants, as a group and individually, were controlling persons of Micro Focus within the meaning of Section 20(a) of the Exchange Act.

264.    Micro Focus violated Section 10(b) of the Exchange Act by its acts and omissions, as alleged above in this Complaint. By virtue of their positions as controlling persons of Micro Focus and as a result of their own aforementioned conduct, the Executive Defendants are liable under Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5, to Lead Plaintiff and other members of the Class who purchased or otherwise acquired Micro Focus ADSs. Moreover, as alleged above, during the respective times these Defendants served as officers or directors or both of Micro Focus, each of these Defendants was culpable for the material misstatements and omissions made by Micro Focus.

265.    As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and other members of the Class suffered damages from their purchases or other acquisitions of Micro Focus ADSs.

**COUNT III**
**Violations of Section 11 of the Securities Act**
**Against Micro Focus, the Director Defendants and Defendants Loosemore, Murdoch,**
**Phillips, and Hsu**

266.    Plaintiff repeats and realleges every allegation contained in paragraphs ¶¶222-240 as if alleged in this Count. This Count is based solely on negligence or strict liability. It is not based on any knowing or reckless conduct by or on behalf of any Defendant, and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud Count, except that any challenged statements of opinion or belief made in or incorporated by reference in the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made and at the time when each part of the Registration Statement became effective.

267.    This claim is brought by Plaintiff on behalf of itself and the other members of the Class who acquired Micro Focus ADSs pursuant to or traceable to the Company's Offering Documents and were damaged thereby. Each member of the Class acquired his, her, or its shares pursuant to or traceable to the Offering Documents. Micro Focus is the issuer of the ADSs through the Offering Documents, which were signed by the Director Defendants (other than Defendant Schultz) and Defendants Loosemore, Murdoch, Brauckmann, and Phillips, and which stated with Defendant Hsu's and Defendant Schultz's consent that Hsu and Schultz would serve as directors of Micro Focus upon the closing of the Merger.

268.    Micro Focus, the Director Defendants, and Defendants Loosemore, Murdoch, Phillips, and Hsu issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and omissions to the investing public

that were contained in the Offering Documents, which misrepresented or failed to disclose, among other things, the facts alleged above. By reason of the conduct alleged in this Count, each Defendant violated Section 11 of the Securities Act, 15 U.S.C. §77k.

269.    Micro Focus is the issuer of the ADSs issued pursuant to the Offering Documents. As issuer of these ADSs, the Company is strictly liable to Plaintiff and the other Class members for the material misstatements and omissions contained in the Offering Documents.

270.    At the times they acquired their shares of the Company, Plaintiff and the other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the facts concerning the misstatements and omissions alleged in this Count.

271.    The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

272.    This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Documents, or after that discovery should have been made by the exercise of reasonable diligence, and within three years after the securities were bona fide offered to the public, i.e., issued in the Merger. It is therefore timely.

273.    The Defendants named in this Count acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Offering Documents and lacked reasonable grounds to believe that this information was accurate and complete in all material respects.

274.    By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77k(e), from Micro Focus,

the Director Defendants, and Defendants Loosemore, Murdoch, Phillips, and Hsu, and each of them, jointly and severally.

**COUNT IV**
**Violations of Section 12(a)(2) of the Securities Act Against**
**Micro Focus**

275.     Lead Plaintiff repeats and realleges the allegations contained in ¶¶222-240 above as if fully alleged in this Count. This Count is based solely on negligence or strict liability. It is not based on any knowing or reckless conduct by or on behalf of any Defendant, and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud Count, except that any challenged statements of opinion or belief made in or incorporated by reference in the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made and at the time when each part of the Registration Statement became effective.

276.     This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*, on behalf of all members of the Class who acquired Micro Focus securities in or traceable to the Offering Documents and were damaged thereby.

277.     Micro Focus was a seller, offeror, and solicitor of sales of the securities offered by the Offering Documents.

278.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Micro Focus's actions of solicitation included participating in the preparation and distribution of the untrue and misleading Offering Documents.

279.     Micro Focus owed to the acquirers of Micro Focus ADSs, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents in order to ensure that the statements were true and that there was no omission to state a material fact required to be stated to make the statements made not

misleading. In the exercise of reasonable care, Micro Focus should have known of the misstatements and omissions contained in the Offering Documents.

280.    Plaintiff and the other members of the Class acquired Micro Focus securities pursuant to and traceable to the defective Offering Documents. Plaintiff and the other members of the Class did not know or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

281.    This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Documents, or after that discovery should have been made by the exercise of reasonable diligence, and within three years after the securities were issued in the Merger. It is therefore timely.

282.    Micro Focus directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, a national securities exchange.

283.    Micro Focus acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Offering Documents and lacked reasonable grounds to believe that this information was accurate and complete in all material respects.

284.    By reason of the foregoing, Micro Focus is liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who acquired securities pursuant or traceable to the Offering Documents and were damaged thereby.

**COUNT V**
**Violations of Section 15 of the Securities Act Against**
**the Director Defendants (Other than Defendant Schultz) and Defendants Loosemore,**
**Murdoch, and Phillips**

285.    Plaintiff repeats and realleges every allegation contained in paragraphs ¶¶222-240 as if fully alleged in this Count. This claim is not based on and does not sound in fraud. This Count is based solely on negligence or strict liability. It is not based on any knowing or reckless conduct by or on behalf of any Defendant, and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in this non-fraud Count, except that any challenged statements of opinion or belief made in or incorporated by reference in the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made and at the time when each part of the Registration Statement became effective.

286.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Director Defendants (other than Defendant Schultz) and Defendants Murdoch, Phillips, and Loosemore.

287.    At all relevant times, the Defendants named in this Count were controlling persons of Micro Focus within the meaning of Section 15 of the Securities Act. As alleged in this Count, because of their executive positions at Micro Focus or on the Micro Focus Board or both, the Defendants named in this Count had the requisite power to directly or indirectly control or influence the decision-making of the Company and the conduct of Micro Focus's business, including the wrongful conduct alleged in this Count.

288.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Murdoch, Loosemore, Brauckmann, and Phillips had direct involvement in the day-to-day operations of the Company, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities law

108

violations alleged in this Count. They were also directly involved in providing false information and certifying or approving the false and misleading statements disseminated by Micro Focus in the Offering Documents. As a result of the foregoing, Defendants Murdoch, Loosemore, Brauckmann, and Phillips, as a group and individually, were controlling persons of Micro Focus within the meaning of Section 15 of the Securities Act.

289.    Defendants Murdoch, Loosemore, Brauckmann, and Phillips also each signed the false and misleading Registration Statement, which was disseminated to the investing public. Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

290.    Similarly, the Director Defendants (other than Defendant Schultz) served as Directors of Micro Focus at the time when they signed the Registration Statement. As directors of a publicly owned company, these Defendants had a duty to disseminate accurate and truthful information with respect to Micro Focus's financial condition and operations. The Director Defendants (other than Defendant Schultz) each signed the Registration Statement, the Offering Documents were disseminated to the investing public, and the Registration Statement became effective. Thus, these Defendants controlled the contents and dissemination of the Offering Documents.

291.    The Defendants named in this Count acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the Offering Documents and lacked reasonable grounds to believe that this information was accurate and complete in all material respects.

292.    By reason of the aforementioned conduct, each of the Defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiff and the other members of the Class with claims under Sections 11 or 12(a)(2) of the Securities Act, as alleged above. As a direct

and proximate result of the conduct of these Defendants, Lead Plaintiff and members of the Class suffered damages in connection with their acquisition of securities pursuant or traceable to the Offering Documents.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.      declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Bernstein Litowitz Berger & Grossmann LLP as Lead Counsel;

B.      awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding Lead Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      awarding Lead Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: November 9, 2018                      Respectfully submitted,

  /s/ James A. Harrod

James A. Harrod
Jai Chandrasekhar
Julia K. Tebor
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jim.harrod@blbglaw.com
jai@blbglaw.com
julia.tebor@blbglaw.com

*Counsel for Lead Plaintiff Iron Workers'
Local No. 25 Pension Fund and Lead Counsel
for the Class*

Michael J. Asher
Jacqui Asher Kelly
**SULLIVAN, WARD, ASHER
& PATTON, P.C.**
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-8412
Telephone: (248) 746-0700
masher@swappc.com
jkelly@swappc.com

*Counsel for Lead Plaintiff Iron Workers'
Local No. 25 Pension Fund*